COMITE ORGANIZADOR DE TRABAJADORES AGRICOLAS (COTA) (AGRICULTURAL WORKERS ORGANIZING COMMITTEE), ANGEL SANTIAGO NATAL, ALEXANDRO MALDONADO, JOSE QUILES RIVERA AND RAMON SANTIAGO, PLAINTIFFS–APPELLANTS, v. KARL MOLINELLI, TRADING AS MOLINELLI FARMS, DEFENDANT–RESPONDENT.

Argued September 26, 1988—Decided February 2, 1989.

*James Katz* argued the cause for appellants (*Tomar, Seliger, Simonoff, Adourian & O'Brien,* attorneys; *Robert F. Williams,* of counsel).

*Jerald R. Cureton* argued the cause for respondent (*Blank, Rome, Comisky & McCauley,* attorneys; *Jerald R. Cureton, Paul A. Tufano,* and *Anne E. Covey,* on the briefs).

*Richard E. Shapiro,* Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae* New Jersey Department of the Public Advocate (*Alfred A. Slocum,* Public Advocate, attorney; *Jose L. Fernandez,* on the brief).

*Jose L. Fernandez* submitted a brief on behalf of *amicus curiae* Tomas Rosa.

The opinion of the Court was delivered by

GARIBALDI, J.

Article I, paragraph 19 of the New Jersey Constitution of 1947 provides in part that "[p]ersons in private employment shall have the right to organize and bargain collectively. . . ." [1] This appeal concerns the rights and remedies available to migrant farm workers under this constitutional provision. The

---

[1]Article I, paragraph 19 reads in its entirety:

"Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."

union activities of farm workers are not protected under either the National Labor Relations Act (29 *U.S.C.A.* §§ 141 to 187) (N.L.R.A.), or any New Jersey statute. Their sole protection arises under this constitutional provision.

I

The plaintiffs are the Comite Organizador de Trabajadores Agricolas ("COTA" or "the Union") and four migrant farm workers (the plaintiffs). COTA is a nonprofit labor union that organizes agricultural workers and negotiates collective bargaining agreements with agricultural employers. The farm workers, Messrs. Angel Santiago Natal, Alexandro Maldonado, Jose Quiles Rivera, and Ramon Santiago, worked for defendant, Karl Molinelli, trading as Molinelli Farms (the employer). Before being discharged in 1985, plaintiffs worked for Molinelli Farms for various periods, ranging from three to twelve years. None of the plaintiffs was rehired by the employer in 1986. Like most migrant farm workers, plaintiffs were hired to plant, harvest, and package various crops. The workers were paid what approximated the minimum wage, and were supplied housing and other needs, such as medical services, banking services, and transportation. They were also paid their plane fare to and from Puerto Rico for purposes of participating in Molinelli's work force.

Defendant, Molinelli, owns and operates a farming business in Vineland, New Jersey. Although defendant's fields are scattered, including both property he owns as well as land he leases, between 1981 and 1985 he farmed virtually the same seventy-five acres of land. During that period, his farming operations consisted of planting, growing, and selling crops throughout the farming season, which normally ran from March to November. In 1985, as well as during the five previous years, defendant operated a labor camp to house his migrant workers. The camp was located on the family homestead on Landis Avenue, which is owned by defendant's broth-

er. Defendant was not required to pay rent for the use of the labor camp but was responsible for its upkeep.

In May 1985, a majority of the agricultural workers in defendant's employ, including the plaintiffs, voluntarily joined COTA, electing it as their exclusive bargaining representative for the negotiation of terms and conditions of employment. COTA requested that defendant recognize the Union and bargain with it.

Defendant refused to recognize either the Union or to submit voluntarily to a secret ballot election. Consequently, on October 7, 1985, plaintiffs filed an action in the Chancery Division seeking a representation election to determine the exclusive bargaining agent for Molinelli's employees pursuant to Article I, paragraph 19 of the N.J. Constitution. On November 29, 1985, the court ordered that a secret ballot election be conducted under the auspices of the New Jersey State Board of Mediation to determine whether a majority of defendant's agricultural employees wished to be represented by COTA for collective bargaining purposes.

Approximately two weeks after the filing of this complaint, as of the week ending October 19, 1985, defendant discharged all of his 1985 work force. Prior to 1985, he had consistently retained his migrant workers until the beginning of November. After terminating the plaintiff farm workers in the middle of October 1985, defendant continued to take crops to market. He hired several different farm workers to harvest crops and continued to hire farm workers on a part-time basis into December 1985. He paid these workers more than the $3.35 per hour that he paid his regular workers during the summer of 1985. He did not keep payroll records relating to the employment of these workers.

On February 7, 1986, the New Jersey State Board of Mediation certified that COTA was unanimously selected as the bargaining representative. In an order dated February 19, 1986, the court declared COTA to be the exclusive bargaining

agent of defendant's agricultural employees and ordered Molinelli Farms "immediately [to] bargain and negotiate in good faith with plaintiff COTA concerning all terms and conditions of agricultural employment."

Although the union repeatedly requested during March 1986 that the defendant meet with its representatives to negotiate regarding the terms and conditions of employment, Molinelli refused to do so. Instead, in a letter dated March 13, 1986, defendant's attorney advised COTA that "Mr. Molinelli's intentions are to cease providing housing for his employees, cease utilizing full-time help and to operate the farm with temporary part-time help. In view of that decision, it would appear that negotiations with your Union would not serve any useful purpose." By correspondence dated March 18, 1986, COTA informed Molinelli that his sudden decision to operate the farm with temporary part-time help did not eliminate his bargaining obligations and urged him to commence bargaining with the union immediately.

Defendant made no efforts to modify or set aside the prior order of the lower court that required him "immediately [to] bargain and negotiate in good faith" with COTA. When he failed to comply with the court's prior bargaining order, plaintiffs sought from the court, pursuant to New Jersey Court Rule 1:10-5, an Order in Aid of Litigant's Rights. On April 29, 1986, the court ordered Molinelli Farms to show cause why plaintiffs should not receive relief in aid of their previously-declared rights. After a brief period of discovery, a plenary hearing was held on June 16, 1986.

At the hearing defendant was the sole witness. He testified that in October 1985 he decided to reduce the number of acres that he would farm and to change the nature of his operation because he had $30,000 of "outstanding bills." It was at that time, Molinelli stated, that he withdrew from his total emphasis on farming and began a trucking business that would transport produce to market. He acquired two trucks, hired a full-time

driver, and operated one of the trucks himself for part of each day. Defendant was attracted to the trucking business because he thought it more stable and less risky. He claimed that his income from farming had been falling and his expenses had been rising since 1983. However, he did not produce any records detailing specific expenditures and sources of income to substantiate his claims.

Nonetheless, in late 1985 and 1986, defendant continued his farming operations. He farmed approximately twenty-four acres of his own property at 5 East Chestnut Street, and about seven acres that he leased. He testified that he had not yet decided whether he would farm the eight acres at his mother's farm on Tuckahoe Road during 1986.

Other than a reduction in the acreage, defendant's 1985 activities remained essentially unchanged. He continued to farm, grow the same crops, and take them to market. Furthermore, he testified that it was his intention to continue farming in 1987 and into the foreseeable future.

Moreover, defendant's 1986 employees performed the same type of work as plaintiffs had done in 1985. Like his 1985 workers, defendant's 1986 workers possessed no special skills or training. The trial court found that "despite the change the defendant is still engaged to a substantial degree in a farming operation that includes unskilled labor and which does not involve any special equipment or training for these particular employees."

Defendant's 1986 workforce was composed of at least two steady hands who worked approximately thirty to thirty-five hours per week according to Molinelli Farm payroll sheets through May 13, 1986. In addition, defendant hired several other employees to work a few hours a day including crews of Mexicans and Cambodians, whom he testified he would likely continue to employ in the future. It is unclear precisely how many employees he actually hired during the 1986 season prior

to the time of the hearing because he did not keep payroll records for all of his workers.

Defendant paid his 1986 employees $3.50 to $4.00 per hour as opposed to the $3.35 received by plaintiffs. He stated that he paid his 1986 employees more because "part-time help you always pay them a little more then, you know, beings [sic] they are only working thirty some hours a week. . . ." He did not pay Social Security benefits for his 1986 employees as he had for his 1985 employees, nor did he pay unemployment insurance for all of his 1986 employees.

Defendant conceded that he never sought to reemploy any of his 1985 employees. He testified that he did not believe that any of these employees wanted to work part time, although he acknowledged that he never asked them or the union whether they wanted to work on that basis. He refused to negotiate with COTA and made no effort to modify or dissolve the court's bargaining order.

In its oral opinion the court noted that the following inference was supported by the evidence:

One of those inferences that I might mention at the outset is the fact that given the resistence [sic] to the initial union organization activities of the plaintiff and given the change in operation by the defendant which came shortly after or at least around the same time that the election was being conducted and that the order ordering the bargaining occurred, there is a fair inference that the change in operation was motivated by some intent on the part of the farm and Mr. Molinelli to avoid the impact of the unionization or to retaliate against the individual workers for their union activity. That inference can be considered by this Court, although there was no direct proof indicating any anti-union sentiment on the part of Mr. Molinelli.

Nonetheless, the court concluded

that the decision to change the operation was not one that was simply a reaction to the union activity and that although the union activity was a factor, it is my judgment that the preponderance of the evidence satisfies me that the decision would have been made even in the absence of the union activity.

The trial court entered an Order on September 16, 1986, that provided:

(1) plaintiff Union is the sole and exclusive employee representative for the negotiation of terms and conditions of employment for all of defendant Employ-

er's agricultural employees; (2) defendant Employer has a continuing obligation to bargain in good faith with plaintiff Union concerning terms and conditions of employment for all of defendant Employer's agriculatural employees, including the obligation to bargain in good faith concerning the terms of a collective bargaining agreement; (3) defendant Employer is obligated to bargain in good faith with plaintiff Union concerning the effects of defendant Employer's change in operations, including the obligation to bargain in good faith regarding the rehiring of defendant Employer's former work force; (4) plaintiffs' motion for reinstatement and back pay for the individual workers, reopening of the labor camp, resumption of defendant Employer's farming operations at the pre–1986 level, and bargaining concerning the decision by defendant Employer to reduce the size of its farming operations is denied; (5) plaintiffs' motion for an award of reasonable costs and attorneys' fees is granted and plaintiffs are granted reasonable costs and attorneys' fees in the amount of $2,500.00 plus $538.66 in costs.

Despite the employer's failure to obey the court's prior bargaining order, and although the court found that the employer remained engaged to a substantial degree in farming and that he had failed to bargain over the effects of his decision to change his operation, including laying off all of his prior labor force, the court refused to order a return to the *status quo ante* or back pay or reinstatement of the migrant farmworkers adversely affected, but simply ordered the employer to negotiate prospectively.

On October 16, 1986, COTA filed a timely Notice of Appeal, requesting that only a portion of the court's order be reversed and that defendant be ordered to provide back pay and reinstatement for the individual workers, reopen its migrant labor camp, and bargain with the Union regarding its decision to reduce the size of its farming operation.

The Appellate Division affirmed for the reasons stated by the trial court. In its unreported opinion, the Appellate Division stressed the continuing duty of defendant to offer any available jobs to the workers represented by the union and to negotiate with the union concerning the terms and conditions of their employment. Nonetheless, the Appellate Division stated that "[w]e do not think that money damages are appropriate in this case and indeed could not determine any fair amount of such damages on this record." Plaintiffs filed a Petition for Certifi-

cation[2] or, in the alternative, Notice of Appeal as of right, pursuant to *Rule* 2:2–1(a), as involving a substantial question arising under the New Jersey Constitution. We granted certification. 110 *N.J.* 178 (1988).[3]

## II

Article I, paragraph 19 became part of the New Jersey Constitution in 1947. Goldberg and Williams, "Farmworkers' Organizational and Collective Bargaining Rights in New Jersey: Implementing Self–Executing State Constitutional Rights," 18 *Rutgers L.J.* 729, 738 (1987). The philosophy of the framers of the 1947 Constitution "was to create a document which would be sufficiently descriptive and expressive to serve the needs of a basic charter and yet remain free of the detail and methods of implementation that might best be left to the legislative process." *Lullo v. International Ass'n of Fire Fighters*, 55 *N.J.* 409, 414 (1970).

No New Jersey statute has been enacted to implement Article I, paragraph 19 with respect to private employers.[4] In the absence of such implementing legislation, we have held that the constitutional provision is self-executing and that the courts have both the power and obligation to enforce rights and remedies under this constitutional provision. *See Cooper v.*

---

[2]Mr. Molinelli proceeded *pro se* before the Appellate Division. However, he retained his present counsel for purposes of responding to plaintiffs' Petition for Certification.

[3]Robert F. Williams, Esq. of the American Civil Liberties Union was of counsel to plaintiffs. The Public Advocate of the State of New Jersey and the Migrant Legal Action Program, Inc. were granted leave to submit briefs as *amici curiae.*

[4]With respect to public employers, Article I, paragraph 19 was implemented in 1968 by the enactment of New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21. Thus when we refer to the lack of statutory implementation of Article I, paragraph 19 we are referring only to the first sentence of paragraph 19, which refers solely to private employers.

*Nutley Sun Printing Co.*, 36 *N.J.* 189, 197 (1961) (the rights of employees declared in *N.J. Constitution of 1947*, Article I, paragraph 19 are enforceable when individuals interfere with those rights ...) (citing *Independent Dairy Workers Union of Hightstown v. Milk Drivers & Dairy Employees Local 680*, 23 *N.J.* 85, 96 (1956) ("*Independent Dairy Workers I*")); *see also Independent Dairy Workers v. Milk Drivers, Local No. 680*, 30 *N.J.* 173, 182 (1959) ("*Independent Dairy Workers II*").

Moreover, we have held that Article I, paragraph 19 imposes an affirmative duty on employers to bargain collectively. In *Independent Dairy Workers I, supra*, the first case in which we construed Article I, paragraph 19, we held that the "[f]reedom of choice in selecting one's bargaining agent is the very essence of collective bargaining" and is protected under the constitutional provision. 23 *N.J.* at 96; *see also Johnson v. Christ Hosp.*, 84 *N.J.Super.* 541, 555 (Ch.1964) ("to impose no affirmative duty upon an employer to bargain collectively with the representative of his employees renders impotent the rights guaranteed to employees under the constitutional provision"), *aff'd*, 45 *N.J.* 108 (1965). Moreover, good faith bargaining is required in order to prevent the "emasculat[ion] of the constitutional provision." *COTA v. Levin*, 212 *N.J.Super.* 362, 368 (Ch.1985).

Article I, paragraph 19 also prohibits dismissal of an employee because of his or her union activities. *Cooper v. Nutley Sun Printing Co., Inc., supra*, 36 *N.J.* at 197 (employer cannot discharge an employee "as a subterfuge for interfering with the right of employees freely to organize and bargain collectively"); *see also Johnson v. Christ Hosp., supra*, 84 *N.J.Super.* at 564, 565 (employer who dismissed employee because of his union activities was held to have violated Article I, paragraph 19 and directed to re-employ the employee).

We likewise have broadly interpreted the scope of the remedies available to workers whose rights have been violated under Article I, paragraph 19. In *Cooper v. Nutley Sun Printing*

*Co., Inc., supra,* 36 *N.J.* at 197, we wrote: "It follows that the court in the present case needs no legislative implementation to afford an appropriate remedy to redress a violation of those rights. To find otherwise would be to say that our Constitution embodies rights in a vacuum, existing only on paper." Moreover, in *Independent Dairy Workers II, supra,* 30 *N.J.* at 182, it was stated:

> For the discharge of employees in violation of their right under Article I, paragraph 19 of the Constitution, an action for damages may well lie, and as well a suit to reinstate with back pay and to forbid discharge because of union activity. Such enforcement of the constitutional guaranty would give to employees the assurance they need to permit them to pursue their own self-interest. [citations omitted]

Although "[i]n general language Article I, paragraph 19 grants and secures to employees in private and public sectors certain basic rights," *Lullo v. International Ass'n of Fire Fighters, supra,* 55 *N.J.* at 415, the specific rights and remedies available to employees under Article I, paragraph 19 remains unclear. In determining the scope of these rights and remedies and the standards used to implement Article I, paragraph 19, we consider federal labor law. Specifically, we regard the "experience and adjudications" under the N.L.R.A. as appropriate and helpful guides for the implementation of Article I, paragraph 19. *Cooper v. Nutley Sun Printing Co., Inc., supra,* 36 *N.J.* at 199–200; *Bowman v. Hackensack Hosp. Ass'n,* 116 *N.J.Super.* 260, 271 (Ch.1971).

### III
### A.

Section 8(a)(3) of the N.L.R.A. states in relevant part that "it shall be an unfair labor practice for an employee ... by discrimination in regard to hire or tenure of appointment to encourage or discourage membership in any labor organization." 29 *U.S.C.A.* § 158(a)(3). The United States Supreme Court has held that an employer does not violate § 8(a)(3) if it goes out of business completely—even if it is motivated solely

by vindictiveness towards the union. *Textile Workers v. Darlington*, 380 *U.S.* 263, 274, 85 *S.Ct.* 994, 1001, 13 *L.Ed.*2d 827, 836 (1964). However, an employer does violate § 8(a)(3) if it partially curtails its business activities for reasons of anti-union animus. *First Nat'l Maintenance Corp. v. NLRB*, 452 *U.S.* 666, 682, 101 *S.Ct.* 2573, 2582, 69 *L.Ed.*2d 318, 333 (1981) (citing *Textile Workers, supra*); *see also Purolator Armored, Inc. v. NLRB*, 764 *F.*2d 1423 (11th Cir.1985) (employer who closed a department of its plant, discharging those who worked in that department, violated § 8(a)(3) because it was found to have acted out of anti-union animus with the intent to chill unionism in other parts of its factory.)

In assessing whether defendant reduced the acreage that he farmed and refused to hire members of his 1985 crew because of anti-union animus rather than for legitimate business reasons, the trial court applied what has been labelled the *Wright Line* test. In *Wright Line*, 251 NLRB 1083 (1980), the National Labor Relations Board (the "NLRB") adopted as its standard in dual motivation cases the test enunciated by the United States Supreme Court in *Mount Healthy City School District Board of Education v. Doyle*, 429 *U.S.* 274, 97 *S.Ct.* 568, 50 *L.Ed.*2d 471 (1977). According to the NLRB's articulation of that test, the employee bears the initial burden of showing that his or her union activity was a "motivating factor" in the employer's decision to discharge the employee. *Wright Line, supra*, 251 NLRB at 1084–85. If this burden is met, the employer must then show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected activity. *Ibid.*

In *In re Bridgewater Township*, 95 *N.J.* 235 (1984), we upheld the Public Employment Relations Commission's (PERC) adoption of the *Wright Line* test in dual motivation cases. *See also East Orange Pub. Library v. Taliaferro*, 180 *N.J.Super.* 155, 163 (App.Div.1981) (adopting *Wright Line* test in PERC context). In approving PERC's adoption of the *Wright Line* test in dual motivation cases, we stated that it was "the best test

yet established for determining causation in dual motive cases."
*Bridgewater, supra,* 95 *N.J.* at 245. According to the Court,

[t]he *Wright Line* test is reasonable because it accommodates the legitimate
conflicting interests inherent in the dual motivation cases. It effectively
weighs the interests of employees in union activity against the interest of the
employer in operating his business as he sees fit. Moreover, it is reasonable
because it is the employer who has best access to proof of his legitimate
business reasons. *Nevertheless, it prevents imbalance in favor of the em-
ployee for it forecloses reinstatement of an employee when the employer
would have taken action anyway but was motivated in part by anti-union
animus.* [*Id.* at 243 (citations omitted & emphasis added).]

In *Bridgewater,* we noted that the *Wright Line* test might be
equally applicable in a private sector case: "we perceive no
reason, and none was offered by the Township, to apply a
different standard in the public sector in New Jersey from that
in the private sector." *Bridgewater, supra,* 95 *N.J.* at 245.
We have long recognized that rights guaranteed to private
employees under Article I, paragraph 19 are substantially
greater than those conferred on public employees. *In re
IFPTE Local 195 v. State,* 88 *N.J.* 393, 401 (1982).

Accordingly, we find that the *Wright Line* approach "is
sound, balanced and fair to both sides," *East Orange Pub.
Library, supra,* 180 *N.J.Super.* at 163, and the appropriate test
to be applied in this case and other cases that arise under
Article I, paragraph 19 of the Constitution concerning private
employers. *Bridgewater, supra,* 95 *N.J.* at 245.

Applying the *Wright Line* test to this case, the trial
court found, and we agree, that the migrant farmworkers made
a sufficient showing to support the inference that their union
activity was a "motivating factor" in their employer's decision
to curtail his operations. The trial court correctly pointed to
defendant's hostility toward union activity as well as the timing
of defendant's decision to reduce the amount of acreage
farmed. Defendant refused to recognize or bargain with the
Union; he violated the February 1986 order of the Chancery
Division, instructing him to bargain in good faith with COTA;
and he repeatedly ignored COTA's request to meet with its

representatives in order to negotiate the terms and conditions of employment. Such resistance can be characterized only as union-related hostility.

Likewise, the timing of defendant's actions supports a *prima facie* case that he acted out of animus. He discharged all of his 1985 work force less than two weeks (October 19, 1985) after COTA filed a petition seeking a representative election, and he announced his intention to employ only part-time help and not to rehire any members of the 1985 work crew for the first time (March 13, 1986) less than one month after the Chancery Division confirmed that COTA was the exclusive bargaining agent for his employees.

In addition, an employer's deviation from past practices can serve as an indicium of anti-union animus. *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 *F*.2d 1175, 1181 (6th Cir. 1985). Here, Molinelli deviated from his past hiring practices in two respects: he refused to rehire in 1986 members of his 1985 work force, some of whom had worked year after year for him or members of his family, and he discharged his 1985 work force in mid-October 1985—earlier than ever before and prior to the time that the agricultural work for the 1985 season had been completed.

Thus, it becomes defendant's burden "to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line, supra*, 251 NLRB at 1084–85. The question under the second part of the *Wright Line* analysis, therefore, is whether defendant successfully proved by a preponderance of the evidence that he would have discharged his entire work force in October 1985 and reduced his operations in 1986 even if no union activity had taken place at his farm.

■ A number of cases deal with the issue of whether an employer has satisfied the second part of the *Wright Line* test. Naturally, this determination depends primarily on the specific facts of the cases. Nonetheless, the cases are instructive

because they demonstrate that once a discharged employee makes out a *prima facie* case of anti-union animus, the employer has the burden of linking the timing of the discharges closely with economic decline. *See Hunter Douglas, Inc. v. NLRB,* 804 *F.*2d 808 (3d. Cir.1986), *cert. den.,* 481 *U.S.* 1069, 107 *S.Ct.* 2461, 95 *L.Ed.*2d 870 (1987) (upheld NLRB finding that employer failed to demonstrate that his company had suffered a decrease in retail orders close enough in time to justify employee's discharge); *NLRB v. Robin Am. Corp.,* 654 *F.*2d 1022 (5th Cir.1981) ("Robin American I") (upheld NLRB finding that employer had not satisfactorily demonstrated a connection between a decline in sales and the timing of employee discharges); *NLRB v. Rain-Ware, Inc.,* 732 *F.*2d 1349 (7th Cir.1984) (upheld NLRB finding that employer had not shown legitimate economic reasons for discharge of employees, given that company sales had not declined significantly more than in past years). *But see Weather Tamer, Inc. v. NLRB,* 676 *F.*2d 483 (11th Cir.1982) (upheld NLRB finding that company layoffs coincided with declines in demand for company products).

There is evidence that defendant would not have discharged his employees nor made certain changes in his operations had there been no union activity on the farm. Nonetheless, the trial court found that he had proven by a preponderance of the evidence that economic considerations would have forced him to take the same actions even if there had been no union activity. Defendant was the only witness at the trial. While his proofs do not appear altogether convincing in light of the substantially unchanged nature of the operation, they were the only evidence before the court and, hence, essentially undisputed. Specifically, the court was persuaded that indebtedness in late 1985 and early 1986 was the root cause for the supposed changes in the operation. The trial court also found persuasive the fact that in 1985 the farm's profit level decreased markedly, *i.e.,* debts exceeded profits by the sum of $30,000.

Although we might not have reached the same conclusion as the trial court in applying the *Wright Line* test, we find

sufficient evidence in the record to support the trial court's findings that defendant's curtailment of his farming operations would have taken place in the absence of his employees' union activity. If there is sufficient credible evidence in the record, a trial court's findings should not be disturbed. *State v. Johnson,* 42 *N.J.* 146, 162 (1964).

### B.

Section 8(a)(5) of the N.L.R.A. provides that it is an unfair labor practice for an employer "to refuse to bargain collectively." 29 *U.S.C.A.* § 158(a)(5). Section 8(d) limits the mandatory subject of bargaining to matters of "wages, hours and other terms and conditions of employment." 29 *U.S.C.A.* § 158(d). A unilateral change by an employer as to a subject within this category violates the statutory duty to bargain. *First Nat'l Maintenance, supra,* 452 *U.S.* at 674, 101 *S.Ct.* at 2578, 69 *L.Ed.*2d at 328.

Plaintiffs argue that the defendant's decision to partially curtail his farming operations represented a unilateral change in the "terms and conditions of employment." Thus, according to plaintiffs, he had a duty to bargain with the union over his decision to reduce the size of his operations.

The trial court found that COTA is the sole and exclusive bargaining agent for defendant's agricultural workers and ordered him "to bargain in good faith with plaintiff Union concerning the *effects* of defendant's change in operations, including the obligation to bargain in good faith regarding the rehiring of defendant employer's former work force." (emphasis added). However, the trial court did not find that Molinelli had to bargain over his *decision* to limit operations.

*First National Maintenance, supra,* is the leading case that addresses the issue of whether an employer must bargain over his decision to close part of his business. First National Maintenance, a company that provided housekeeping and maintenance services to numerous nursing homes, decided to termi-

nate its contract with the Greenpark nursing home after Greenpark refused to agree to an increase in the fees that it paid to First National. As a result of First National's decision to end its relationship with Greenpark, the company's Greenpark employees lost their jobs. The union that represented these employees filed an unfair labor practice complaint charging that First National had failed to bargain with the union over its decision to terminate the Greenpark contract. The union maintained that First National had acted unilaterally to alter the "terms and conditions of employment."

The United States Supreme Court held that First National did not commit an unfair labor practice when it failed to engage in decision bargaining with the union. In concluding that the decision was not part of § 8(d)'s "terms and conditions" the Court determined that the employer's need to operate freely in deciding whether to shut down part of its business outweighed the incremental benefit that might be gained through the union's participation in making the decision. 452 *U.S.* at 686, 101 *S.Ct.* at 2584, 69 *L.Ed.*2d at 335. The Court noted that First National's decision to terminate its relationship with Greenpark was undertaken "purely for economic reasons." *Ibid.*

The Supreme Court also concluded that there was "no dispute" that the union representing First National's Greenpark employees should have been given a significant opportunity to bargain about the effects of the company's partial closing. *Id.* at 681, 101 *S.Ct.* at 2582, 69 *L.Ed.*2d at 332. "Effects" bargaining must be conducted in a "meaningful manner and at a meaningful time," and the National Labor Relations Board (NLRB) is empowered to impose sanctions to assure its adequacy. *Id.* at 681–82, 101 *S.Ct.* at 2582–83, 69 *L.Ed.*2d at 332–33.

■ *First National Maintenance* has been cited consistently to support findings that an employer must bargain over the effects of a decision made without anti-union animus to terminate or relocate operations but not over the decision itself. *See*

*Local 2179, United Steelworkers of America v. NLRB*, 822 *F*.2d 559, 570 (5th Cir.1987); *Amalgamated Local 813, Int'l Union v. Diebold Inc.*, 605 *F.Supp.* 32, 37 (N.D.Ohio 1984); *Metropolitan Teletronics Corp.*, 279 NLRB 957, 959 (1986); *Morco Indus.* 279 NLRB 762, 763 (1986); *Highland Ranch v. Agricultural Labor Relations Bd.*, 29 *Cal*.3d 848, 853, 633 *P*.2d 949, 954, 176 *Cal.Rptr.* 753, 758 (1981) (employer need not bargain over decision to sell ranch under California's Agricultural Labor Relations Act (ALRA), West's Ann.Cal.Labor Code 1140 to 1166.3, following N.L.R.A. precedent). However, in *NLRB v. Robin Am. Corp.* (*"Robin American II"*), 667 *F*.2d 1170 (5th Cir.1982), the Fifth Circuit upheld an NLRB order requiring an employer who closed down a department in its plant because of anti-union animus to engage in decision bargaining. *See also Strawsine Mfg. Co., Inc.*, 280 NLRB No. 63 (1986) (employer obligated to bargain about decision to close down and relocate plant when decision made for purposes of preventing union activity).

██ We find that defendant did not commit an unfair labor practice when he failed to negotiate with the union over his decision to reduce the number of acres that he farmed. Because there is sufficient evidence to support the trial court's finding that he curtailed his farming operations because of legitimate economic concerns, we apply the rule of *First National Maintenance, supra,* that an employer does not have to bargain over its decision to close down part of its business. 452 *U.S.* at 686, 101 *S.Ct.* at 2584, 69 *L.Ed*.2d at 335–36.

However, we find that Molinelli committed an unfair labor violation when he failed to bargain about the effects of his decision to curtail significantly the acreage that he farmed. *First National Maintenance* makes it absolutely clear that an employer must bargain over the effects of a partial closing. Defendant failed to do this. Indeed, the record discloses that defendant acted in complete disregard of the farm workers' validly elected union. He ignored a court bargaining order.

He never discussed with COTA his employment of new workers on a temporary basis for the 1986 season. In short, defendant acted as if the union did not exist.

Farm laborers are not to be hurt by employers for joining unions. An employer's refusal to bargain with such workers, and unilateral change in their working conditions, in violation of the New Jersey Constitution and the trial court's order to bargain, will constitute an unfair labor practice without any need to show anti-union *animus*. Defendant was under a duty to bargain with COTA over the *effects* of his decision to change the nature of his operations by partially curtailing his acreage and hiring a temporary labor force. Defendant's refusal to bargain with the union over the *effects* of his decision to change the size of his farming operation constitutes a violation of the plaintiffs' rights under Article I, paragraph 19. This violation of the farm workers' rights should not go without remedy.

## IV

The trial court ordered as a remedy that the employer bargain in good faith with the union over the terms and conditions of employment for all of his agricultural employees and that he bargain in good faith with the union concerning the effects of his change in operations, including the obligation to bargain in good faith regarding the rehiring of his former work force. In addition, plaintiffs were granted reasonable costs and attorneys' fees. The trial court, however, did not grant back-pay or reinstatement of the individual plaintiffs nor did it require defendant to resume his farm operations at the pre-1986 level or require him to bargain over his decision to curtail his farming operation.

The Appellate Division affirmed the trial court's order, stressing the continuing duty of the employer to offer any available jobs to union members and to negotiate with the union concerning the terms and conditions of their employment. However, like the trial court, the Appellate Division did not

think money damages were appropriate and indeed "could not determine any fair amount of such damages in the record." We disagree with the Appellate Division's refusal to impose monetary damage on defendant for his unfair labor violations. Accordingly, we reverse the Appellate Division's judgment with respect to the remedy.

Unless an employer's unfair labor practices are effectively remedied, COTA and other unions that represent migrant farm workers will be substantially weakened, if not decimated. Employers will be apt to commit unfair labor violations if they know that their employees have no effective remedy. If COTA and other such unions cannot adequately protect their members, prospective members will not join these unions. The message to migrant farm workers will be clear: if you choose to deal with a union, you run the risk of economic capital punishment, for which there is no effective judicial remedy.

Migrant farm workers are particularly vulnerable to an employer's pressures. Isolated and rootless from the community, they "are *unorganized and without economic or political power*. It is their plight alone that summoned government to their aid." *State v. Shack*, 58 *N.J.* 297, 303 (1971) (emphasis added). The "seasonal nature of the employment, the residence of many workers in Puerto Rico ... language barriers, lack of legal advocacy, and isolated living and working conditions all combine to make it especially difficult for farm workers to recognize their constitutional rights." Farmworkers Organizational and Collective Bargaining Rights, *supra*, 18 *Rutgers L.J.* at 763. Recognizing these factors, "[t]he courts and Legislature of New Jersey have demonstrated a progressive attitude in providing legal protection for migrant farm workers." *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 *N.J.* 86, 99 (1980). *See*, for example, the Seasonal Farm Labor Act, *N.J.S. A.* 34:9A–1 to –41.

The United States Supreme Court recognized in *Phelps Dodge Corp. v. National Labor Relations Board*, 313 *U.S.* 177,

197–98, 61 *S.Ct.* 845, 853–54, 85 *L.Ed.* 1271, 1285 (1941), that "[m]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board (NLRB) enforces." In *Phelps Dodge* the Supreme Court noted that remedies must be considered on a case-by-case basis to "avoid the rigidities of an either-or-rule." 313 *U.S.* at 198, 61 *S.Ct.* at 854, 85 *L.Ed.* at 1285. While recognizing the difficulties in determining the appropriate remedy, the Supreme Court emphasized the freedom given the Board to "attain just results in diverse, complicated situations." *Id.* at 198, 61 *S.Ct.* at 854, 85 *L.Ed.* at 1285.

The nature and scope of remedies have been broadly interpreted under Article I, paragraph 19. Thus, courts interpreting remedies under Article I, paragraph 19 also have the discretion to "attain just results in diverse complicated situations." *Ibid.;* see *Cooper, supra,* 36 *N.J.* at 199; *Independent Dairy Workers II, supra,* 30 *N.J.* at 182; Farmworkers Organizational and Collective Bargaining Rights, *supra,* 18 *Rutgers L.J.* at 754–62. As with the implementation of rights under Article I, paragraph 19, in determining the appropriate remedies, we consider the remedies that have been applied under the N.L.R. A.

Generally, where there is a failure to bargain over effects, courts follow the limited backpay model established by the NLRB in *Transmarine Navigation Corp.,* 170 NLRB 389 (1968). See *Yorke v. NLRB,* 709 *F.*2d 1138, 1144–46 (7th Cir.1983), *cert. den.,* 465 *U.S.* 1023, 104 *S.Ct.* 1276, 79 *L.Ed.*2d 680 (1984); *Metropolitan Teletronics Corp., supra,* 279 NLRB at 283; *Highland Ranch v. Agricultural Labor Relations Bd., supra,* 176 *Cal.Rptr.* at 761–64, 633 *P.*2d at 957–60.[5] The

---

[5]Backpay from the day of discharge or backpay plus reinstatement are the more appropriate remedies for an illegal discharge or illegal *Darlington* closing resulting from anti-union animus under § 8(a)(3). *See National Labor Relations Board v. Master Slack and/or Master Trousers Corp.,* 773 *F.*2d 77, 83 (6th Cir.1985); *Purolator Armored, Inc., supra,* 764 *F.*2d at 1431–33; *N.L.R.B. v. Fort*

*Transmarine* Board explained the principles it used in fashioning its remedies as follows: "[W]e must be guided by the principle that the wrongdoer, rather than the victims of the wrongdoing, should bear the consequences of his unlawful conduct, and that the remedy should be adapted to the situation that calls for redress." *Transmarine, supra,* 170 NLRB at 284. The Board recognized that the N.L.R.A. requires more than pro forma bargaining:

[P]ro forma bargaining is all that is likely to result unless the Union can now bargain under conditions essentially similar to those that would have obtained, had Respondent bargained. If the Union must bargain devoid of all economic strength, we would perpetuate the situation created by Respondent's deliberate concealment of relevant facts from the Union which prevented the Union from meaningful bargaining. [*Id.,* quoting *Royal Plating and Polishing Co., Inc.,* 160 NLRB 990, 997 (1966)].

Therefore, the Board concluded that

in order to assure meaningful bargaining and to effectuate the purposes of the Act, we shall accompany our order to bargain over the effects of the shutdown with a limited backpay requirement designed both to make whole the employees for losses suffered as a result of the [violation] and to re-create in some practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequences for the Respondent. [*Transmarine, supra,* 170 NLRB at 284].

The *Transmarine* remedy imposes a prospective requirement on the employer to pay each terminated employee a daily sum equal to the employee's former wages during the mandated bargaining process. *Highland Ranch v. Agricultural Labor Relations Bd., supra,* 633 *P.*2d at 958–59, 176 *Cal.Rptr.* at 762–63. This limited backpay award runs from the time of the Board's decision until an agreement is reached, an impasse occurs or the union fails to bargain in good faith. *Id.* at 958–59, 176 *Cal.Rptr.* at 762–63. A maximum backpay benefit is placed on the employer's monetary obligations by specifying that in no event should any employee receive daily payments for a period of time exceeding the period it had taken the employee to obtain alternative employment after his termi-

---

*Vancouver Plywood Co.,* 604 *F.*2d 596, 601–03 (9th Cir.1979), *cert. den.,* 445 *U.S.* 915, 100 *S.Ct.* 1275, 63 *L.Ed.*2d 599 (1980).

nation. *Id.* at 959, 176 *Cal.Rptr.* at 763. Likewise, a minimum backpay benefit equal to two weeks' wages is guaranteed to the employee. *Ibid.* The *Highland* court also noted that since the *Transmarine* decision in 1968, the NLRB has imposed virtually identical limited backpay remedial orders in numerous cases in which an employer failed to bargain with a union over the effects of its decision to go out of business. *Ibid.*

We have held that backpay and reinstatement are appropriate remedies to enforce the constitutional guarantee of Article I, paragraph 19 of the New Jersey Constitution. *See Cooper, supra,* 36 *N.J.* at 199; *Independent Dairy Workers II, supra,* 30 *N.J.* at 182. We see no reason why *Transmarine*'s well-established limited pay remedy would not be a good point from which to develop appropriate remedies in this case.

Due to the seasonal nature of plaintiffs' work, the curtailment of the employer's farming operation, and the length of time between the employer's refusal to obey the court's first order to bargain and this decision, we remand this matter to the trial court to impose an appropriate monetary remedy. We do not require the trial court to apply *Transmarine*'s limited pay model rigidly in this case. We leave it to the trial court's discretion to fashion a remedy that "attains just results in [this] diverse, complicated situation." *Phelps Dodge Corp., supra,* 313 *U.S.* at 198, 61 *S.Ct.* at 854, 85 *L.Ed.* at 1285.

Accordingly, we affirm the judgment of the Appellate Division in part and reverse in part and remand the matter to the Chancery Division for further proceedings in accordance with this opinion.

*For affirmance in part; for reversal in part and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.