644 A.2d 76

GEORGE HARMS CONSTRUCTION CO., INC., A NEW JERSEY CORPORATION, RONNIE ALLEN, CARLOS ALVAR, DAVID BADER, CHRISTINE BALIKO, WILLIAM MCMULLAN AND BRUCE ROBERTSON, APPELLANTS–APPELLANTS, v. NEW JERSEY TURNPIKE AUTHORITY, A BODY CORPORATE AND POLITIC, RESPONDENT–RESPONDENT.

---

IN THE MATTER OF THE ADOPTION OF A RESOLUTION BY THE NEW JERSEY TURNPIKE AUTHORITY REQUIRING CON-TRACTORS TO ENTER INTO PROJECT AGREEMENTS WITH LABOR UNIONS.

Argued January 31, 1994—Decided July 7, 1994.

*Theodore W. Geiser* argued the cause for appellant George Harms Construction Co., Inc. (*Connell, Foley & Geiser* and *Grotta, Glassman & Hoffman,* attorneys; *Mr. Geiser* and *Theodore M. Eisenberg,* of counsel; *Mr. Geiser, John F. Neary, Vincent E. McGeary, Guy T. Lytle, Michael Barabander,* and *Mark E. Tabakman,* on the briefs).

*Morris M. Schnitzer* argued the cause for appellants Ronnie Allen, Carlos Alvar, David Bader, Christine Baliko, William McMullan and Bruce Robertson.

*Steven E. Brawer* argued the cause for appellant Utility & Transportation Contractors Association of New Jersey, Inc. (*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg,* attorneys).

*Jeffrey J. Greenbaum* argued the cause for respondent, New Jersey Turnpike Authority (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys; *Mr. Greenbaum* and *Clive S. Cummis,* of counsel; *Mr. Greenbaum, Kenneth F. Oettle, Mark S. Olinsky,* and *Paul P. Josephson,* on the briefs).

*Vincent J. Apruzzese* argued the cause for *amicus curiae* United States Chamber of Commerce (*Apruzzese, McDermott, Mastro & Murphy,* attorneys; *Mr. Apruzzese, Francis A. Mastro,* and *Daniel F. Crowe,* on the brief).

*Christine Piatek,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Michael J. Herbert* submitted a brief on behalf of *amici curiae* American Road & Transportation Builders Association, The New Jersey Asphalt Pavement Association, and The National Utility Contractors Association (*Picco, Mack, Herbert, Kennedy, Jaffe & Yoskin,* attorneys; *Mr. Herbert, Patrick D. Kennedy,* and *Gregory J. Sullivan,* of counsel and on the brief).

*Frederick J. Rohloff* and *John C. Connell* submitted a brief on behalf of *amici curiae* The Associated Builders and Contractors, Inc., Associated Builders and Contractors of New Jersey, and Associated Builders and Contractors of Northern New Jersey (*Archer & Greiner,* attorneys).

*Richard D. Wilkinson* submitted a brief on behalf of *amicus curiae* National Constructors Association (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys; *Robert W. Kopp,* a member of the New York bar, of counsel).

*Michael Critchley* submitted a brief on behalf of *amici curiae* New Jersey State Building and Construction Trades Council and Building and Construction Trades Department, AFL–CIO.

The opinion of the Court was delivered by

O'HERN, J.

This appeal presents the question of whether a State agency has the power to require a contractor doing business with it to enter into a "project labor agreement" with designated unions. A

"project labor agreement" is a form of prehire agreement with labor organizations under which a contractor agrees to use the members of specified labor organizations on a project in exchange for the member unions' guarantees of labor stability. Such agreements serve important purposes in assuring efficient and economical administration of large construction projects. We hold, however, that our State public-bidding laws and the policies underlying them do not now contemplate the use of such agreements by State agencies to require contractors to hire members of only certain designated labor organizations to the exclusion of all others.

## I

We base our opinion on the facts as represented by respondent, New Jersey Turnpike Authority (TPA).

In 1990, the TPA began to widen the Turnpike between Interchanges 11 and 15E (the Widening Project). The contracts for the Widening Project were subject to the competitive-bidding provisions of the "lowest responsible bidder" statute, *N.J.S.A.* 27:23-6.1(a). On August 24, 1993, George Harms Construction Co., Inc. (Harms) bid the lowest price to perform Contract No. W-6411, which covered the stretch of the Turnpike between Interchanges 14 and 15E, known as the "Southern Mixing Bowl." Harms's bid price was $20,464,360, and the next lowest bid was $20,542,393. However, on the same day, the TPA's Director of Law issued an internal memorandum recommending that the TPA award Widening Project contracts only to contractors that had entered into "project labor agreements." For authority, that memo relied on *Building & Construction Trades Council v. Associated Builders & Contractors, Inc.,* —— *U.S.* ——, 113 *S.Ct.* 1190, 122 *L.Ed.*2d 565 (1993) (*Boston Harbor*), which established that the National Labor Relations Act (NLRA), 29 *U.S.C.A.* §§ 151 to 169, does not preempt the use of project-labor agreements by state agencies acting as market participants in the construction industry. On August 31, 1993, the TPA adopted Resolution 19-93, which provided, in pertinent part, the following:

WHEREAS, in consideration of the critical nature of timely completion of the 1990-95 Widening Project * * * and the recent labor disruption affecting the

Widening Project, it is in the best interest of the Authority to implement the use of project labor agreements with respect to all construction contracts awarded heretofore and hereafter as part of the Widening Project;

NOW THEREFORE, BE IT RESOLVED that, for the foregoing reasons, as a condition of all contracts heretofore and hereafter advertised by the New Jersey Turnpike Authority in connection with the Widening Project, the Chief Engineer shall require contractors and subcontractors of all levels to enter into project labor agreements with the appropriate affiliated locals of the Building and Construction Trades Council of the AFL–CIO of the State of New Jersey * * *.

Resolution 19–93 defined a "project labor agreement" as

an agreement that recognizes designated unions as the exclusive bargaining representatives for all construction and craft employees, in exchange for the stipulation that there be no work stoppages, slowdowns, or disruptions during the life of the construction contract to which it applies, and which, therefore, contributes to a spirit of harmony, labor-management peace and stability during the life of that contract * * *.

Thus, Resolution 19–93 would have required the TPA to award the contract to the lowest-responsible bidder that had entered into a project-labor agreement with Building and Construction Trades Council (BCTC) unions.

The preference in the awarding of contracts allegedly stemmed from the State's concern that, in the words of Resolution 19–93, "the Authority ha[d] recently experienced labor disturbances namely work stoppages * * *." The TPA's Director of Law explained at the August 31, 1993, Executive Session that "[l]abor disturbances were threatened at Harms' construction site in the vicinity of Interchange 8A, and Harms requested that the [TPA] provide Harms' forces with State Police protection." The TPA's Chief Engineer was more specific: "[I]n light of the July 1993 statewide strike of highway and utility construction sites by Local 825 and the refusal of other AFL–CIO locals to cross Local 825's picket lines, any further strikes would cause intolerable delays in light of the [TPA's] December 1995 deadline for completion of the Widening." Such delays would have hampered New Jersey's efforts to comply with federal clean-air requirements by 1996 to obtain federal transportation funds, and certain permits from the Army Corps of Engineers might have expired if work had been interrupted.

The conflict between the BCTC-affiliated Operating Engineers Local 825 and the United Steelworkers of America (the Steelworkers), to which Harms's employees belong, apparently stems from a jurisdictional dispute. As we understand that dispute, it revolves around the contrasting work patterns of the two unions. Steelworkers members will apparently perform a wide variety of different tasks, such as operating heavy machinery, digging ditches, and carpentry. Members of Local 825, on the other hand, only operate heavy machinery. When BCTC unions are involved, carpentry and digging must be performed by members of the Carpenters' and Laborers' Unions, not by the International Union of Operating Engineers.[1]

On August 27, 1993, the TPA's Chief Engineer delivered a letter to Harms's president notifying Harms of a proposed project-labor-agreement requirement. The letter stated that the TPA would adopt the policy on August 31, 1993, and that the policy would apply to Contract No. W–6411 retroactively. The letter did not state that the policy would require Harms to sign the project-labor agreement with a BCTC affiliate. Harms assertedly discovered that fact when its counsel appeared at the TPA's Executive Session on August 31, 1993. Harms's counsel protested the policy because inasmuch as Harms had a long-standing collective-bargaining agreement with the Steelworkers, the NLRA precluded Harms from signing a project-labor agreement with any other union. However, the TPA disregarded Harms's objections and passed Resolution 19–93 as well as Resolution 25–93, which provided for the rejection of all current bids on Contract No. W–6411 to allow rebidding under the new policy. On September 15, 1993, the TPA's Executive Director denied Harms's appeals protesting

---

[1] The Local 825–Steelworkers conflict seems to have been eased by an AFL–CIO–sponsored agreement between BCTC and the Steelworkers that was signed on February 24, 1994. Under that agreement, BCTC unions have promised not to picket Steelworkers' construction sites or exert economic pressure against Steelworkers-organized contractors. See *Steelworkers to Stop Construction Organizing*, 145 *Lab.Rel.Rep.* 289 (1994).

the TPA's rejection of Harms's bid and refused to reinstate the bid.

On September 13, 1993, then-Governor Florio executed Executive Order No. 99, which required all State agencies to adopt project-labor agreements with BCTC affiliates "whenever feasible and whenever such agreement[s] substantially advance[ ] the interests of costs, efficiency, quality, safety, timeliness and the State's policy regarding minority- and women-owned businesses * * *." 25 *N.J.R.* 4543 (Oct. 4, 1993).

On September 14, 1993, Harms and some of its employees who belong to the Steelworkers appealed the TPA's adoption of Resolutions 19–93 and 25–93. The Appellate Division heard that appeal with another appeal brought by the Utility and Transportation Contractors Association of New Jersey and subsequently issued a single unreported opinion sustaining the validity of the TPA's resolutions. The court held that the TPA's project-labor-agreement requirement for the Widening Project is permissible under the NLRA and that such agreements do not infringe on a person's constitutional right "to organize and bargain collectively." *N.J. Const.* art. I, ¶ 19. Further, the court rejected Harms's contention that the TPA could not incorporate project-labor agreements into bid specifications without agency rulemaking. It found that those agreements do not conflict with the statutory duty of the TPA to award contracts to "the lowest responsible bidder."

We granted certification, 134 *N.J.* 560, 636 *A.2d* 518 (1993). Subsequently, on March 21, 1994, newly-elected Governor Whitman issued Executive Order No. 11, 26 *N.J.R.* 1558–59 (Apr. 18, 1994), which superseded Executive Order No. 99. Executive Order No. 11 allows project-labor agreements only "on a project-by-project basis" and does not require the use of any particular union. Because Executive Order No. 11 explicitly declares that it is "to have prospective effect only," 26 *N.J.R.* at 1559, the appeal before us is not moot.

## II

*Did the TPA comply with administrative due process in its adoption of the project-labor-agreement requirement and its rejection of Harms's bid?*

### A.

Appellants argue that the agency's resolutions are rules within the statutory definition of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –21, and therefore that the agency must comply with the notice-and-comment provision of *N.J.S.A.* 52:14B–4. That provision essentially requires that prior to the adoption of any rule, the agency shall give at least thirty-days notice of its intended action; provide a summary of the proposed rule, with an opportunity for all interested persons to submit data, views, or arguments in writing or orally; and prepare a report summarizing the content of such submissions and the agency's response to those views, data, and arguments.

This Court's decision in *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984), delineates the appropriate test to apply when determining whether an agency action constitutes rulemaking. Among the factors to be considered are: (1) the segment of the public to be affected; (2) the generality of application; (3) the prospectiveness of the result; and (4) the novelty of the legal standard announced. *Id.* at 331–32, 478 *A.*2d 742. All such factors need not be present for an agency determination to constitute rulemaking. *Id.* at 332, 478 *A.*2d 742. The agency should balance the factors according to weight, not number. *In re Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 518, 524 *A.*2d 386 (1987).

The TPA denies that the *Metromedia* factors are implicated. It contends that the specification of project-labor agreements is altogether exploratory and tentative as applied to the Widening Project and thus does not constitute rulemaking. Appellants contend that the policy is far more extensive than that because it will apply to all succeeding Turnpike-improvement projects. They further contend that the agency adopted the policy hurriedly,

without consultation or comment from any members of the interested public. We do not resolve in this case whether this agency action is subject to the strict requirements of *N.J.S.A.* 52:14B–4. We believe that the substantive issues transcend those procedural issues. We are certain, however, that whatever policies for project-labor agreements the TPA pursues, it would develop such policies more effectively following a hearing process. In addition, that process would establish a record against which the contesting claims under constitutional and statutory guidelines could be better assessed by a reviewing court. Specifically, if the record clearly established the relationship between the specifications and the policies of the bidding laws, we could better resolve the question of compliance with public-bidding laws. For example, a detailed record with comment and response as frequently occurs in the rulemaking context, see *N.J.S.A.* 52:14B–4, might have better explained how Harms's present employees might have fit into the bidding scheme. Could Harms have retained them as the TPA believes, or did the hiring-hall provisions effectively exclude them? A project-labor agreement has many subtle and complex facets, *infra* at 21–24, 644 *A.*2d at 83, and overall agency policy should address the merits of the plethora of issues that are proper for inclusion in a project-labor agreement.

### B.

Although the APA might not have required notice and a hearing prior to the adoption of the project-labor-agreement requirement, we address the notion of administrative due process. The APA alone does not exhaust the requirement of administrative due process; "the fact that [ ] agency action is not subject to the strict requirements of [the APA] does not mean that no process is required." *In re Dep't of Ins.'s Order Nos. A89–119 & A90–125,* 129 *N.J.* 365, 382, 609 *A.*2d 1236 (1992). If the APA does not apply, we have held that "so long as the parties had adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response, due

process would be fundamentally satisfied." *Ibid.* The TPA argues that due-process requirements have been met in this case because it provided Harms's counsel with the opportunity to attend and to speak at the Executive Session during which both the resolution establishing the project-labor-agreement requirement and the resolution vacating Harms's bid were adopted. We agree. Principles of administrative due process do not require that we reinstate Harms's bid.

■ Although the TPA did not deny Harms administrative due process, we resolve here the remaining question whether the TPA had the authority to reject all bids after it had opened Harms's bid. In *Cardell, Inc. v. Township of Woodbridge,* 115 *N.J.Super.* 442, 450, 280 *A.*2d 203 (App.Div.1971), the court noted that public entities do not have "unbridled power to reject bids, even where such right is served in the invitation for bidding" because such power would violate public policy and competitive-bidding laws. However, the court stated:

> We do not imply that a [public entity] is without power to reject all bids under proper circumstances. No [public entity] could effectively engage in competitive bidding without such power. At the very least, the existence of the possibility of total rejection of bids serves as a strong inducement to bidders to keep their bids as low as circumstances permit. Suffice it to say that when a [public entity] concludes in good faith that the purposes of the public bidding statute are being violated, it may reject all bids submitted and in its discretion order a readvertising of the contract. Furthermore, * * * should circumstances arise which might cause the [public entity] to abandon or substantially revise the project, then a total rejection of bids might well be required.
>
> [*Id.* at 450–51, 280 *A.*2d 203.]

The Appellate Division, in *M.A. Stephen Construction Co. v. Borough of Rumson,* 117 *N.J.Super.* 431, 438, 285 *A.*2d 55 (1971), applied the *Cardell* rationale and held that a public entity could not circumvent the requirement of our public-bidding laws to award contracts to the lowest responsible bidder by the entity's arbitrary or unreasonable action. Further, the *M.A. Stephen* court held that a public entity had the right to reject all bids and the duty to exercise that right "in good faith and for sound public reasons." *Ibid.*

The TPA's Resolution 25–93 rejected all bids received for Contract No. W–6411 because the bid specifications provided to prospective contractors lacked the requirement that contractors enter into a project-labor agreement with appropriate BCTC unions. That resolution, together with Resolution 19–93, contained the TPA's reasoning for rejecting the bids. The TPA materially changed its specifications incorporating the project-labor requirement to ensure prompt settlement or prevention of labor disputes in the public sector, which is our State's declared policy, see *N.J.S.A.* 34:13A–2; to guarantee labor stability; and to advance harmonious labor-management relations. In the best interest of the TPA and the public, the TPA wanted to complete in a timely manner the Widening Project within the Project's budget. The TPA had experienced work stoppage on the Widening Project for approximately three weeks in July 1993. That circumstance, along with the *Boston Harbor* decision, caused the TPA to "substantially revise the project" by including a bid specification requiring potential contractors to enter into project-labor agreements with BCTC unions and rejecting all bids submitted on Contract No. W–6411. *Cardell, supra,* 115 *N.J.Super.* at 451, 280 *A.*2d 203. The TPA may have erred in its view of the law, but on this record, no evidence exists to show that in rejecting all bids the agency acted other than in good faith, in its interest, and in the interest of the public.

## III

What is a project-labor agreement?

We do not intend this to be a treatise on economics or labor relations but merely general background for the issues as we understand them. For background information on collective bargaining in the construction industry, we draw on general reference materials, and primarily on an overview of the construction industry set forth in David B. Brenner, *The Effect of ERISA Preemption on Prevailing Wages and Collective Bargaining in the Construction Industry,* 1993 *Det.C.L.Rev.* 1123.

In that article, Mr. Brenner explains the tremendous economic significance of the construction industry:

> The construction industry plays a strategic role in determining the health and vitality of the U.S. economy. Construction accounts for an estimated 7–15% of the nation's total economic activity. As of April 1993, Department of Commerce estimates for the total value of new construction at a seasonally adjusted annual rate was $444.4 billion. Public construction comprised $116.2 billion of that amount.
>
> Because of its large size, construction exerts its influence on other sectors of industry and impacts their labor relations.
>
> [*Id.* at 1127 (footnotes omitted).]

However, the author proceeds to observe that although the construction industry's economic significance may be national in scope, "[t]here can be no replacement for the reality that, even if some of the individual components may change or are imported from outside a local labor market, the ultimate assembly of a bridge or a building remains a localized affair." *Ibid.*

The pattern of employment in the construction industry is characterized by employee mobility. Workers are assembled for specific jobs. A general contractor often subcontracts portions of the job according to interest and ability. The subcontractors may also delegate various aspects of their work. As a result, the industry uses union hiring halls as a primary source of labor. (A hiring hall is a place where workers report and the union refers those workers to contractors for employment.)

Obviously, to compete successfully in the market, a bidder must know the cost of labor for a job. What is known as a "Little Davis Bacon Act" or a "Prevailing Wage Statute" requires New Jersey contractors, as it does those in other states, to pay the prevailing-wage rate on public-bidding projects. *N.J.S.A.* 34:11–56.27. Because the construction industry is still substantially unionized, that requirement in effect means paying union wages on public jobs. Consequently, most public contractors have used union employees on public-works projects. Different unions, however, have different work practices. See *supra* at 16, 644 *A.*2d at 80.

Contractors also use prehire agreements to ensure labor-cost predictability. "A pre-hire agreement is a contract agreed to by

an employer and a union *before* the workers to be covered by the contract have been hired." *International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB,* 843 *F.*2d 770, 773 (3d Cir.), *cert. denied,* 488 *U.S.* 889, 109 *S.Ct.* 222, 102 *L.Ed.*2d 213 (1988). Initially, the National Labor Relations Board (NLRB) had determined that prehire agreements were illegal in that they designated an exclusive union representative for the employees before an election had been held. Recognizing the impact of that holding in the construction industry, Congress added section 8(f) to the NLRA in 1959. That section provides:

> It shall not be an unfair labor practice * * * for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members * * * because (1) the majority status of such labor organization has not been established * * * or (2) such agreement requires as a condition of employment, membership in such labor organization * * *.
>
> [29 *U.S.C.A.* § 158(f).]

Thus, section 8(f) expressly authorizes negotiation, adoption, and implementation of collective-bargaining agreements in the construction industry without initial reference to the union's actual majority status and permits such agreements to contain union-security clauses. In that amendment, Congress specifically sanctioned established industry practices that the NLRB had previously found unlawful. However, although section 8(f) permits employers and unions in the construction industry to enter into prehire agreements that designate a union as the exclusive representative without a formal election, the employees, now union members, may vote to decertify the union as their exclusive representative, using the formal NLRA procedures. 29 *U.S.C.A.* § 159(e).

Employees may belong to a local union of their craft that sends representatives to a council such as the BCTC. Among its other functions, a council may act as bargaining agent and it may conduct negotiations for its member unions. Generally, a council is financially supported by the local unions, which in turn pass on the cost to their members. Employers will often enter master

agreements with councils such as BCTC to mitigate the effect of jurisdictional disputes among unions on the progress of construction projects. Such councils have been recognized as labor organizations for purposes of the NLRA. *NLRB v. Metallic Bldg. Co.*, 204 *F.2d* 826 (5th Cir.1953), *cert. denied*, 347 *U.S.* 911, 74 *S.Ct.* 473, 98 *L.Ed.* 1068 (1954); *Southeast La. Bldg. & Constr. Trades Council v. Scheyd, Brennan, Inc.*, 334 *F.Supp.* 720 (E.D.La.1971).

A project-labor agreement is a form of master agreement limited to one project. Most such agreements

> require[ ] the contractors and subcontractors to recognize [a particular labor organization] as bargaining representative for all craft employees, to hire workers through the hiring halls of the [organization's] constituent unions, to require hired workers to join the relevant union within seven days, to follow specified dispute-resolution procedures, to apply the [organization's] wage, benefit, seniority, apprenticeship and other rules, and to make contributions to the * * * unions' benefit funds. In return for the [proprietor's] promise to insist that contractors sign the agreement, the [organization] * * * promise[s] the [proprietor] labor peace throughout the * * * life of the construction project.
>
> [*Associated Builders & Contractors, Inc. v. Massachusetts Water Resources Auth.*, 935 *F.2d* 345, 360 (1st Cir.1991) (Breyer, C.J., dissenting), *rev'd sub nom. Building & Constr. Trades Council v. Associates Builders & Contractors, Inc.*, —— *U.S.* ——, 113 *S.Ct.* 1190, 122 *L.Ed.2d* 565 (1993).]

In this case, the TPA required contractors and subcontractors working on the Widening Project to enter into a project-labor agreement with the New Jersey BCTC, an AFL–CIO organization comprised of several different unions representing various crafts.

## IV

> Does the *Boston Harbor* decision preemptively determine the validity of the TPA's project-labor-agreement resolution?

In his August 24 memorandum to the Executive Director of the TPA, the agency's Director of Law referred to the *Boston Harbor* decision as the legal basis for the TPA's adoption of Resolution 19–93:

> Recent analysis by General Counsel of the [*Boston Harbor*] case confirms that the New Jersey Turnpike Authority could legally enforce pre-hire arrangements between contractors and labor unions working on the Turnpike. Specifically, the Authority, by way of supplemental bid specifications, could require that a contrac-

tor on a given construction project enter into a project labor agreement guaranteeing stability for the life of the project.

The issue in *Boston Harbor* was whether the Massachusetts Water Resource Authority could require as a condition for a contract award that the winning bidder and its subcontractors abide by a project-labor agreement previously negotiated between Kaiser Engineers, Inc. and the Boston Metropolitan District BCTC. That agreement recognized BCTC as the exclusive bargaining representative for all workers employed to build sewage-treatment facilities for the cleaning of Boston Harbor in return for BCTC's promise of labor peace throughout the ten-year life of the construction project. Specifically, the question was whether the agreement violated the NLRA.

 Two types of federal-labor-law preemption forbid certain kinds of state action. They are succinctly described in *Boston Harbor* as follows:

The first, "Garmon pre-emption," forbids state and local regulation of activities that are "protected by § 7 * * *, [which establishes the right of employees to organize, bargain collectively, and engage in peaceful picketing and strikes,] or constitute an unfair labor practice under § 8." * * *

* * * * * * * *

A second pre-emption principle, "Machinists pre-emption," prohibits state and municipal regulation of areas that have been left " 'to be controlled by the free play of economic forces.' "

[*Boston Harbor, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 1194–95, 122 *L.Ed.*2d at 574–75 (citations omitted) (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 *U.S.* 236, 244, 79 *S.Ct.* 773, 779, 3 *L.Ed.*2d 775, 782 (1959), and *Machinists v. Wisconsin Employment Relations Comm'n,* 427 *U.S.* 132, 140, 96 *S.Ct.* 2548, 2553, 49 *L.Ed.*2d 396, 403 (1976) (quoting *NLRB v. Nash–Finch Co.,* 404 *U.S.* 138, 144, 92 *S.Ct.* 373, 377, 30 *L.Ed.*2d 328, 333 (1971))).]

That latter preemption principle is well illustrated by *Golden State Transit Corp. v. City of Los Angeles,* 475 *U.S.* 608, 106 *S.Ct.* 1395, 89 *L.Ed.*2d 616 (1986), in which the Court held that federal labor law preempts a city's power to condition the renewal of a taxi franchise on settlement of a labor dispute.

 The theory of the *Boston Harbor* decision is that when a state acts as a market participant, it does not act as a regulator in

areas of national labor policy that are preempted by the NLRA. Justice Blackmun wrote:

> When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, or for NLRB jurisdiction. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation.*

> \* \* \* \* \* \* \* \*

> It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes post-hire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry.

> There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same.

> [*Boston Harbor, supra,* —— U.S. at ——, ——, 113 *S.Ct.* at 1196, 1198, 122 *L.Ed.*2d at 575–76, 578–79 (citations omitted).]

Thus, under *Boston Harbor,* federal labor law does not prohibit a state entering the construction market from using the same construction-industry exception regarding project-labor agreements that private purchasers of construction labor use. However, a state's laws may prohibit a project-labor-agreement specification in public contracts without running afoul of the NLRA. *Garmon* preemption does not apply because a state-law prohibition of project-labor agreements on public projects is merely one way in which a state may choose to act as a market participant in the construction industry. In other words, a state may choose to enter or not to enter a project-labor agreement just like any other purchaser of construction services. *Machinists* preemption also does not apply because a state-law prohibition of project-labor agreements on public projects does not constitute impermissible regulation of an area that the NLRA contemplated would be left

to the free play of economic forces. Such a prohibition amounts to nothing more than the public equivalent of a corporation's by-law regarding the purchase of construction services. In short, when a state uses project-labor agreements on public projects, it is not acting as a regulator of private actors; rather, it is merely defining its role as a proprietor/purchaser of labor in the construction industry. Thus, because the NLRA does not preempt the field, we must determine whether New Jersey law prohibits project-labor agreements.

## V

Does New Jersey law prohibit the State from using project-labor agreements designating particular unions?

Courts have only a limited role to play in reviewing the actions of other branches of government. In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n*, 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983). Courts can intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy. Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. *Campbell v. Department of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *In re Larsen*, 17 *N.J.Super.* 564, 570, 86 *A.*2d 430 (App.Div.1952). We address in this opinion only the first two factors, *i.e.*, whether the action violates either constitutional principles or express or implied legislative policies. Before we consider the issues of legislative policy, we examine the

implications of the TPA's actions in light of the New Jersey Constitution's collective-bargaining-rights provision.

### A.

Does the New Jersey Constitution prohibit the State from using project-labor agreements designating particular unions?

Certain appellants and certain *amici* contend that the New Jersey Constitution prohibits project-labor agreements that require the use of specific unions on public projects. They believe that even if authorized by the Legislature, such project-labor agreements do not accord with constitutional principle. Other appellants and *amici* disagree. Because we decide this case on statutory grounds alone, we need not resolve the constitutional questions. *See, e.g., O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 240, 624 *A.*2d 578 (1993) (holding that "courts should not reach constitutional questions unless necessary to the disposition of the litigation"). However, we set forth the arguments of the parties and some of the concerns a court would have to address in deciding the constitutional issues.

The New Jersey Constitution declares in paragraph 19 of article I that "[p]ersons in private employment shall have the right to organize and bargain collectively." Although "we regard the 'experience and adjudications' under the N.L.R.A. as appropriate and helpful guides for the implementation of Article I, paragraph 19," *Comite Organizador de Trabajadores Agricolas v. Molinelli*, 114 *N.J.* 87, 98, 552 *A.*2d 1003 (1989), NLRA precedents do not define the State constitutional right in the absence of preemption. (Paragraph 19 was intended to protect workers who are not covered by the NLRA. *See* Richard A. Goldberg and Robert F. Williams, *Farmworkers' Organizational and Collective Bargaining Rights in New Jersey: Implementing Self–Executing State Constitutional Rights*, 18 *Rutgers L.J.* 729, 742 (1987).) Thus, State law defines the scope of the constitutional right guaranteed by paragraph 19. In that respect, our courts have held that "the right to organize and bargain collectively is not only constitutional

in its dimension but should be accorded the 'same stature as other fundamental rights.'" *Communication Workers v. Atlantic County Ass'n for Retarded Citizens,* 250 *N.J.Super.* 403, 408, 594 *A.*2d 1348 (Ch.Div.1991) (quoting *Cooper v. Nutley Sun Printing Co.,* 36 *N.J.* 189, 197, 175 *A.*2d 639 (1961)).

 Under federal Fourteenth Amendment analysis, "[w]hen * * * legislation regulates 'fundamental rights' * * *, it will be subject to 'strict scrutiny' and the state will be required to demonstrate (1) that a compelling need justifies the legislation and (2) that no less restrictive alternative will accomplish that state objective." *United States Chamber of Commerce v. State,* 89 *N.J.* 131, 157–58, 445 *A.*2d 353 (1982). However, we have held that

> [t]he analysis of fundamental rights under the New Jersey Constitution differs from analysis of those rights under the United States Constitution. Starting with our decision in *Robinson v. Cahill,* 62 *N.J.* 473, 491–92 [303 *A.*2d 273], *cert. denied sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973), we began to develop an independent analysis of rights under article 1, paragraph 1. Thereafter, we rejected two-tiered equal protection analysis and employed a balancing test in analyzing claims under the state constitution. In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.
>
> [*Greenberg v. Kimmelman,* 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985) (citations omitted).]

In applying that three-part balancing test, the more personal the right, the greater the public need must be to justify governmental interference with the exercise of that right. *See Taxpayers Ass'n v. Weymouth Township,* 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976), *cert. denied,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). Whether characterized as the denial of equal protection or the infringement of a fundamental right, the analysis would largely be the same.

 "Freedom of choice in selecting one's bargaining agent is the very essence of collective bargaining. The courts of this State have recognized, at least inferentially, that *N.J. Const.* 1947, *Art.* I, *sec.* 19, guarantees this freedom of choice * * *." *Independent Dairy Workers Union v. Milk Drivers and Dairy Employees*

*Local No. 680*, 23 *N.J.* 85, 96, 127 *A.*2d 869 (1956) (citations omitted). That freedom of choice demands that "when a group of persons in private employment [has] freely exercised [its] right to choose a bargaining representative, the will of the majority may not be undermined by picketing where the sole object is economic duress upon the employer and the employees." *Id.* at 97–98, 127 *A.*2d 869. Thus, no third party, including another union, may exert economic coercion on a group of employees to influence its choice of bargaining representatives.

The question presented by some of the plaintiffs here is whether the State or one of its agencies has improperly coerced New Jersey construction workers in their choice of bargaining representatives by favoring one group of unions over others in the award of public contracts. The TPA's Resolution 19–93 required all contractors performing Widening Project contracts to sign project-labor agreements with a designated labor organization. Then–Governor Florio's Executive Order No. 99 broadened that requirement to include all State construction contracts. Efforts by a labor organization to interfere with the statutory rights of workers under the NLRA to elect a bargaining representative of their own choosing are questionable under *Independent Dairy Workers, supra*, 23 *N.J.* 85, 127 *A.*2d 869. *See* 29 *U.S.C.A.* § 158(b)(4)(ii)(D) (making it unfair labor practice for labor organization to strike or engage in other coercive activity for the purpose of "forcing or requiring any employer to assign particular work to employees in a particular labor organization").[2] Accession to demands that infringe constitutional rights has been held elsewhere to comprise a civil-rights violation. *See, e.g., Redgrave v. Boston Symphony Orchestra, Inc.*, 399 *Mass.* 93, 502 *N.E.*2d 1375 (1987) (holding that under Massachusetts Civil Rights Act, defen-

---

[2] We do not intend to assess in this opinion the validity of informational or organizational picketing, which has as its object to convince the employees to recognize the picketing organization as their bargaining representative. On that subject, see generally Louis B. Livingston, *Strikes, Picketing, and Lockouts*, 176 *ALI–ABA* 1481, 1519–20 (1992).

dant may be liable for interference with rights of another even if defendant had no personal desire to abridge those rights, but merely acquiesced to pressure from third parties who did wish to abrogate such rights). Of course, this begs the question of whether any rights have been infringed. The parties disagree about that point.

Employees of Harms argue as appellants that the TPA has diminished the State constitutional rights of New Jersey construction workers to choose a union free from external pressure. The TPA counters that it has not denied any Harms employees the right to be represented by labor organizations of their own choosing and that Harms is free as well to obtain workers through its preferred labor organization. The TPA essentially argues that it has denied neither Harms nor its employees any rights; rather, it has merely denied Harms and its employees the privilege of obtaining Turnpike contracts. That reasoning recalls Justice Holmes's famous aphorism: "A policeman may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 155 *Mass.* 216, 29 *N.E.* 517, 517–18 (1892). More subtle and indeed more complex principles are now employed to analyze the dispensation of government benefits. The question today is whether the government has unreasonably burdened the exercise of a constitutional right by conditioning the dispensation of a government benefit (*i.e.*, a public contract) on how one has exercised that right (*i.e.*, which union a bargaining unit has chosen). *See, e.g., Sherbert v. Verner*, 374 *U.S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.*2d 965 (1963) (striking down denial of unemployment benefits to Seventh-day Adventist whose employer had discharged her because she refused to work on Saturday in accordance with her religious beliefs). Through restrictive conditions on the award of public contracts, the State could theoretically limit the freedom of choice that New Jersey construction workers currently exercise in designating unions to bargain for them. And if the State could favor one union over another, it could favor, by the same logic, nonunion contractors over union contractors.

Although "[t]he right to employment on a local public works project, like the right to a city job, is not fundamental for purposes of equal protection analysis," *United Bldg. & Constr. Trades Council v. Mayor & Council,* 88 *N.J.* 317, 343, 443 *A.2d* 148 (1982), *rev'd on other grounds,* 465 *U.S.* 208, 104 *S.Ct.* 1020, 79 *L.Ed.2d* 249 (1984), the right not to be denied a public contract for invidious reasons, such as race, or religion, *is* a fundamental right.[3] Does the denial of public work because of union affiliation violate a similar fundamental right?

Were we to resolve that question, we would have to determine (1) the nature of the right to choose one's bargaining representative, (2) whether a public-contract specification that does not by its terms prohibit the free choice of a bargaining representative may still impinge on that right, and (3) if the specification does impinge on that right, whether the public need for the restriction justifies its imposition.

Among the factors to be considered in assessing that public need would be the availability of other mechanisms to achieve the same substantive goal, such as a no-strike clause requiring all workers to work without interruption during the term of the project or an agreement to resolve jurisdictional disputes by reference to independent arbitrators. For example, the State might consider a bid specification that would require jurisdictional disputes to be mediated by an "impartial jurisdictional disputes board." *See, e.g., Drywall Tapers & Pointers of Greater New York, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Internat'l Assoc.,* 954 *F.2d* 69, 71 (2d Cir.1992) (discussing both national Plan of Settlement of Jurisdictional Disputes in the Construction Industry and New York Plan for the Settlement of Jurisdictional Disputes). Finally, we would consider the extent to

---

[3] The United States Supreme Court has not upheld preferential treatment on the basis of race in the award of public contracts even for the important purpose of favoring minority contractors to remedy general societal racial discrimination against minorities that occurred in the past. *City of Richmond v. J.A. Croson Co.,* 488 *U.S.* 469, 109 *S.Ct.* 706, 102 *L.Ed.2d* 854 (1989).

which we must defer to legislative action in defining the contours of a constitutional right. *Hills Dev. Co. v. Township of Bernards,* 103 *N.J.* 1, 510 *A.*2d 621 (1986).

We are certain that the Legislature is as fully aware as we of the nature of the affected rights, the extent of any intrusion thereon, and the public need for such intrusion.

### B.

Does the TPA have the statutory power to require project-labor agreements that designate exclusive labor representatives for workers on public projects?

To resolve this inquiry we must consider two questions: (1) did the Legislature delegate to the TPA the power to require project-labor agreements with a designated union, and (2) would the exercise of such power conflict with other statutory requirements?

### 1.

Has the Legislature delegated to the TPA the power and established proper standards to require contractors on projects to enter project-labor agreements with designated unions?

On the first point, appellants argue that the Legislature would not intend that an executive agency adopt so far-reaching a policy in the absence of express statutory authorization. Appellants support their argument by the separation-of-powers doctrine.

"[W]ithin limits the legislature may delegate its authority to a government agency." *Township of Mount Laurel v. Department of Pub. Advocate,* 83 *N.J.* 522, 532, 416 *A.*2d 886 (1980); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 82–83, 411 *A.*2d 168 (1980). "[T]he Legislature may not vest unbridled or arbitrary power in [an] administrative agency," *Ward v. Scott,* 11 *N.J.* 117, 123, 93 *A.*2d 385 (1952), but "[a]s long as the discretion of administrative officers is 'hemmed in by standards sufficiently definitive to guide its exercise,' the delegation of legislative powers is not unconstitutional." *Township of Mount Laurel, supra,* 83 *N.J.* at 532, 416 *A.*2d 886 (quoting *Cammarata v. Essex County Park Comm'n,* 26

*N.J.* 404, 410, 140 *A.*2d 397 (1958)); *accord In re Egg Harbor Assocs.*, 94 *N.J.* 358, 372, 464 *A.*2d 1115 (1983).

Standards must accompany the delegation of power for three reasons:

First, [they] prevent[ ] the Legislature from abdicating its political responsibility and prevent[ ] undemocratic, bureaucratic institutions from wielding all-encompassing, uncontrollable government power. Second, limiting standards define the area in which the agency develops the experience and expertise that the legislature has neither the time nor resources to develop. With too broad a standard the agency stands in no better position than the legislature that created it. Third, and most important, standards facilitate judicial review of agency decisions, which guards against arbitrary and capricious governmental action. As long as the statutory standards achieve these purposes, such standards should be considered sufficiently definite to pass constitutional muster.

[*Township of Mount Laurel, supra,* 83 *N.J.* at 532–33, 416 *A.*2d 886.]

Our courts have consistently sustained the delegation of legislative authority under broad and general statutory standards governing the manner in which administrative agencies must exercise the authority delegated. Thus, against constitutional attacks, we have upheld standards authorizing the Public Advocate to represent the "public interest" in administrative and court proceedings, *Township of Mount Laurel, supra,* 83 *N.J.* 522, 416 *A.*2d 886, and standards requiring the Department of Environmental Protection to "use its power to promote the health, safety, and welfare of the public." *Egg Harbor Assocs., supra,* 94 *N.J.* at 372, 464 *A.*2d 1115. In other circumstances, we have given broad latitude to executive agencies to flesh out the contours of a statutory mission. *See, e.g., GATX Terminals Corp. v. New Jersey Dep't of Envtl. Protection,* 86 *N.J.* 46, 429 *A.*2d 355 (1981).

Obviously, the mission of the TPA is to operate and maintain the most efficient roadways possible for the citizens of the State. *N.J.S.A.* 27:23–5. If in the construction and maintenance of that highway system the TPA deems a project-labor agreement necessary, the proposition that the requirement of such an agreement is within the TPA's mission is difficult to reject.

The more difficult question is whether standards exist to guide the agency's discretion. For example, how far does the agency's

discretion extend, and may that discretion be delegated to third parties? For example, in *Utility Contractors Ass'n of New England, Inc. v. Department of Public Works*, 29 *Mass.App.Ct.* 726, 565 *N.E.*2d 459 (1991) (*Central Artery* ), the consultant for the Department of Public Works actually negotiated the project-labor agreement with the building-trades council, an organization representing the building-trades unions. The Department of Public Works intended to require prospective contractors to execute such an agreement. Among the features of that agreement were provisions that:

1. Dictated the scheduling of hours of work;
2. Limited the contractor's right to select supervisors;
3. Determined the circumstances under which employees might be discharged;
4. Precluded in effect the hiring of any employees not members of the unions.

Brief for the Utility Contractors Association of New England, Inc. at 10–12, *Central Artery, supra,* 565 *N.E.*2d 459 (Nos. 90–P–921, 90–P–1062).

Here the TPA did not use an independent agent to negotiate the project-labor agreement but attached a proposed form of the agreement to its bid specifications, stating that potential qualified contractors must consent to enter into such an agreement with BCTC unions. The record does not disclose whether the form agreement was negotiated, by whom it was negotiated, or what requirements were placed on the negotiator by the TPA. The most relevant standards to guide the agency's action are in our State's public-bidding laws. A closer examination of the TPA's delegated statutory power and those bidding standards is warranted.

### 2.

Are the TPA's bid specifications consistent with the policies of the State's public-bidding laws?

The TPA is a body corporate and politic and is responsible for, among many other duties, facilitating vehicular traffic in the State by acquiring, constructing, maintaining, repairing, and operating turnpike projects. *N.J.S.A.* 27:23–5(e). When entering into

certain contracts to fulfill those responsibilities, the TPA is required to advertise publicly for bids and must award such contracts to the lowest-responsible bidders. *N.J.S.A.* 27:23–6.1(a). The Widening Project contracts are subject to that public-bidding statute.

In *Terminal Construction Corp. v. Atlantic County Sewerage Authority,* 67 *N.J.* 403, 341 *A.*2d 327 (1975), our Court expressed the policy reasons for competitive-bidding statutes.

> Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. To achieve these purposes all bidding practices which are capable of being used to further corrupt ends or which are likely to affect adversely the bidding process are prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process.
>
> [*Id.* at 409–10, 341 *A.*2d 327.]

Although that case concerned competitive bidding under the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49, the underlying operation and policy of that law are identical to that of *N.J.S.A.* 27:23–6.1(a), which governs this case. *Cubic W. Data, Inc. v. New Jersey Turnpike Auth.,* 468 *F.Supp.* 59, 63 n. 4 (D.N.J.1978).

a.

Did the unsettled nature of this project-labor agreement render the bid specification invalid in that the unions were not bound to the terms of the agreement at the opening of the bid?

To conform with statutory requirements, bid specifications for public contracts

> shall be sufficiently full and explicit to notify prospective bidders of the kind and nature of the subject of the contract and set up a common standard of competition, in short, supply such information as will afford all bidders a fair and reasonable opportunity for competition and enable them to bid intelligently.
>
> [*Camden Plaza Parking, Inc. v. City of Camden,* 16 *N.J.* 150, 159, 107 *A.*2d 1 (1954).]

" 'The necessity of having a common standard and the importance of definite and precise specifications upon which to found corporate action are too apparent to require argument.' " *Waszen v.*

*City of Atlantic City,* 1 *N.J.* 272, 283–84, 63 *A.*2d 255 (1949) (quoting *Tice v. Long Branch,* 98 *N.J.L.* 214, 215, 119 *A.* 25 (E. & A.1922)).

The record fails to disclose whether an executed project-labor agreement to which a contractor might agree to be bound existed on the date of the opening of the bid. As we understand the record, on September 3, 1993, the TPA readvertised for bids for Contract No. W–6411–1. The TPA scheduled the opening of those bids for September 22, 1993. On September 17, 1993, the TPA issued an addendum to its contract documents of September 3. The addendum contained supplemental bid specifications requiring that as a condition of the award of contract, contractors shall enter into a project-labor agreement with appropriate BCTC unions. Also, on September 17, counsel to the applicable BCTC unions forwarded to the TPA a project-labor agreement executed by the unions to allow any contractor who was awarded the contract to enter into the agreement. The record does not disclose if potential contractors executed the project-labor agreement at the time the bids were returnable. Certain appellants insist that this is an illusory offer because it lacks consideration. The contract specification seems to have allowed the bidder to supply the executed project-labor agreement after the award of bids. Settled principles of public bidding dictate that no material element of a bid may be provided *after* bids are opened. *A & S Transp. Co. v. Bergen County Sewer Auth.,* 133 *N.J.Super.* 266, 276, 336 *A.*2d 57 (Law Div.), *aff'd,* 135 *N.J.Super.* 117, 342 *A.*2d 865 (App.Div.1975). The reason for that is to prevent any possibility of favoritism.

As the Attorney General explained in a letter brief submitted to us in another public-contract case: "To utilize post-execution change orders or supplementary agreements as a mechanism for accomplishing goals established prior to contract execution would, at a minimum, create an appearance of impropriety. When the public competitive bidding process is involved, even an appearance of impropriety cannot be tolerated." Letter Brief for the New

Jersey Department of Transportation at 9, *In re Route 287 Wetland Replacement* (No. M–1098, Sept. Term 1993). *See generally Township of Hillside v. Sternin,* 25 *N.J.* 317, 322, 136 *A.*2d 265 (1957) (holding nonconforming bid invalid). Of course, usually the contractor seeks to reserve discretion regarding the variables in a contract, but the principle appears relevant when a third party is involved.

Avoidance of any potential for contract manipulation is a central theme of all public-bidding doctrine. As Justice Francis once said: "In this field it is better to leave the door tightly closed than to permit it to be ajar, thus necessitating forevermore in such cases speculation as to whether or not it was purposely left that way." *Id.* at 326, 136 *A.*2d 265. Although this argument about the third party's power to vary the bid has surface logic, it is not a practical concern. We find highly unlikely that a labor organization designated as the source of labor on a State contract would decline to enter a contract that would provide work for its members.

b.

Does the concept of the "lowest responsible bidder" permit a public entity to condition the award of a contract on provision of a unionized labor force?

*N.J.S.A.* 27:23–6.1(a) provides that the TPA, "in the exercise of .its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, * * * shall award * * * contract[s] to the lowest responsible bidder * * *." In *Trap Rock Industries, Inc. v. Kohl,* 59 *N.J.* 471, 284 *A.*2d 161 (1971), *cert. denied,* 405 *U.S.* 1065, 92 *S.Ct.* 1500, 31 *L.Ed.*2d 796 (1972), we stated that "the legislative mandate that a bidder be 'responsible' embraces moral integrity just as surely as it embraces a capacity to supply labor and materials." *Id.* at 481, 284 *A.*2d 161. Responsibility may also involve the financial ability, experience, and skills of the bidder. *Arthur Venneri Co. v. Paterson Hous. Auth.,* 29 *N.J.* 392, 403, 149 *A.*2d 228 (1959). Does the characteristic of responsibility encompass a contractor's use of a designated union such as BCTC for its labor force? In *Wittie Electric Co. v. State,* 139 *N.J.Super.* 529,

532, 354 *A.*2d 659 (App.Div.1976), the court held that a contractor's employment of nonunion labor was not an appropriate factor to consider when assessing the responsibility of that contractor, who had submitted the lowest bid for a public contract. The State did not appear to have a requirement for union labor listed among the specifications for the contract in *Wittie.*

In addition, the Attorney General had earlier rendered a formal opinion declaring that the State could not reject the lowest bid on a public-construction project solely on the basis that the bidder employs nonunion labor and award the contract to the next lowest bidder that employs only union-affiliated labor. *Op. Att'y Gen.* No. 24, 123 (1975). The Attorney General observed that *N.J.S.A.* 52:32–2, dealing with contracts for the repair or construction of public buildings, mandates that the State award the contract to the "lowest responsible bidder." The opinion noted that our courts have established the criteria for determining the lowest-responsible bidder. *Id.* at 124. Heretofore, union affiliation had not been recognized as such a criterion. In that opinion, the Attorney General explained the holding of *Keyes Electrical Service v. Board of Chosen Freeholders,* 15 *N.J.Super.* 178, 83 *A.*2d 61 (Law Div.1951). In *Keyes,* the court held that the county was permitted to reject all bids and to add an amended specification to the project requiring that the prospective contractor hire employees who will work in harmony with the other trades employed on the public-construction project and that all labor conform to the practices of the local labor unions because the specification was basically a standard employment practice and was not discriminatory. *Id.* at 187–88, 83 *A.*2d 61. The Attorney General points out, however, that the *Keyes* court said that the amended specification did not prohibit the lowest bidder (who was nonunion) from bidding a second time. Further, the Attorney General noted that if the county had refused to award the contract to the plaintiff after submitting the lowest bid a second time, the court would recognize the bidder's claim and remedy it. *Keyes, supra,* 15 *N.J.Super.* at 183–84, 83 *A.*2d 61, had cited *Paterson Chronicle Co. v. Mayor & Aldermen,* 66 *N.J.L.* 129, 48 *A.* 589 (Sup.Ct.1901),

which allowed review of a city resolution requiring that the municipality purchase printing services from only union shops on the basis that the exclusion of sources of services "not of a specified class * * * tends to create a monopoly and impose a possible additional burden on the taxpayers." *Id.* at 131, 48 *A.* 589.

Historically, other states have adhered to policies that disallow public-bidding requirements demanding union affiliation. See *Mugford v. Mayor & City Council,* 185 *Md.* 266, 44 *A.*2d 745, 747 (1946) (noting that municipality cannot discriminate in favor of labor union members); *In re Cristo, Inc. v. State of N.Y. Office of General Services,* 42 *A.D.*2d 481, 349 *N.Y.S.*2d 191, 193–94 (1973) (holding that agency abused its discretion in rejecting lowest bidder because nonunion); *State ex rel. United District Heating, Inc. v. State Office Building Commission,* 125 *Ohio St.* 301, 181 *N.E.* 129, 129 (1932) (holding public agency may not deny contract to lowest bidder on sole ground union labor not employed exclusively); *Daniel B. Van Campen Corp. v. Building & Construction Trades Council,* 202 *Pa.Super.* 118, 195 *A.*2d 134, 137 (1963) (noting that city may not distinguish between contractors employing nonunion workers from those employing union workers).

However, a Minnesota law authorizes the City of Minneapolis to enter into project-labor agreements with "appropriate labor organizations and contractors" to provide labor stability and prevent work stoppage for city construction projects and projects concerning its convention center and related facilities. 1989 *Minn.Sess. Law Serv.* ch. 54, § 2. The city has included those agreements in its bid specifications for such projects. *See Glenwood Bridge, Inc. v. City of Minneapolis,* 940 *F.*2d 367 (8th Cir.1991).

To our knowledge, no State court of last resort has resolved the issue of the claimed invalidity of project-labor agreements under State law. In *Central Artery, supra,* the specification was withdrawn. 565 *N.E.*2d at 461. In *Northern Ohio Chapter of Associated Builders & Contractors, Inc. v. Gateway Economic Development Corp.,* No. 1:92 CV 0649, 1992 *WL* 119375, at *14 (N.D.Ohio

May 12, 1992), the State-law claims were dismissed but not decided once federal jurisdiction was lost.

c.

Do public-bidding laws permit a public entity to specify a sole source of labor on its projects?

Another issue is whether, under our public-contract-bidding laws, State agencies may draft bid specifications knowingly to exclude all but one supplier of construction labor. As noted, the fundamental premise of the *Boston Harbor* decision is that a governmental agency that is acting as a market participant is "purchasing contracting services." —— *U.S.* at ——, 113 *S.Ct.* at 1198, 122 *L.Ed.*2d at 578–79. In that role, it "acts just like a private contractor would act." *Associated Builders, supra,* 935 *F.*2d at 361 (Breyer, C.J., dissenting).

A private contractor can pick a sole source of labor or materials. May a government contractor do so? Our constitutional traditions bespeak a denial of legislative power to create monopolies, making the acquisition of franchises open to all. *N.J. Const.* art. IV, § 7, ¶ 9. In passing only general laws, the Legislature benefits the public by creating a healthy competition among those who seek the franchises. *Atlantic City Water Works Co. v. Consumers Water Co.,* 44 *N.J.Eq.* 427, 15 *A.* 581 (Ch. 1888). In a recent decision reviewing "sole source" or "lock out" bidding specifications, the Law Division has repeated the principles that apply in such cases:

The purpose of the bidding laws is to protect the public by placing bidders on an equal footing and to ensure that competition will eliminate the possibility of fraud, extravagance or favoritism in the expenditure of public funds. * * * Bidders are induced to participate by the promise of impartiality which only quality specifications can insure.

[*Utilimatic, Inc. v. Brick Township Mun. Util. Auth.,* 267 *N.J.Super.* 139, 144, 630 *A.*2d 862 (Law Div.1993) (citation omitted).]

Under those principles, the court held that "the specifications cannot be so precise as to knowingly exclude all but one prospective bidder." *Id.* at 145, 630 *A.*2d 862. Although some projects are so unique that specifications will come close to creating a sole

source, *In re Burroughs Corp. Protest,* 184 *N.J.Super.* 416, 446 *A.*2d 533 (App.Div.1981), that does not appear to be an issue here.

Our Local Public Contracts law, which is analogous to the TPA bidding statute, *N.J.S.A.* 27:23–6.1(a), *supra* at 36, 644 *A.*2d at 90–91, states that any specification that "knowingly excludes [with certain statutory exceptions] qualification by any but one bidder * * * shall be null and void * * *." *N.J.S.A.* 40A:11–13. All specifications are to be drawn "in a manner to encourage free, open and competitive bidding." *Ibid.*

The TPA counters the concern about a sole-source bidding specification by arguing that, quite to the contrary, its bids are open to all. That is like saying that a bid specification that requires a contractor to use "Smith Family Steel" would be acceptable because "anyone can bid on the job." True enough, but does real competition exist? And although prevailing-wage acts minimize any potential difference in hourly-wage costs, we do not yet understand that all conditions of work are identical in the building industry.

On this note, we observe that Governor Whitman's Executive Order No. 11, which superseded then-Governor Florio's Executive Order No. 99, recognizes the use of project-labor agreements when appropriate but refrains from designating a particular union, trade council, or labor organization. In a March 21, 1994, statement that accompanied Executive Order No. 11, Governor Whitman noted that Executive Order No. 99 had "raised questions about competitiveness" and that her order was intended to "broaden competition for public works contracts."

Considering all the factors, we conclude that the TPA's specification that prospective contractors enter project-labor agreements in this case is not now consistent with the policies of our State's bidding laws.

## VI

To sum up, as the source of its authority to require a project-labor agreement on its bid, the TPA relied on the *Boston Harbor*

decision. However, the *Boston Harbor* decision *does not give* the TPA the power to require contractors to enter project-labor agreements. The *Boston Harbor* decision holds only that federal labor law *does not prevent* a state or public entity, acting as purchaser of contracting services, from requiring adherence to project-labor agreements on public-construction work.

The authority of the State or one of its entities to require project-labor agreements derives from the organic law of the State. The New Jersey Constitution, article I, paragraph 19, guarantees that "[p]ersons in private employment shall have the right to organize and bargain collectively." That right has been defined as a fundamental right. Project-labor agreements requiring the designation of an exclusive labor organization for public-construction work affect that right by allowing the State to select, at least initially, the bargaining representative of employees. The New Jersey Constitution does not contain the construction-industry exception set forth in 29 *U.S.C.A.* § 158(e), (f). We have, however, generally recognized the right of the Legislature to shape, at least in the context of public employment, the contours of the constitutional right. *Lullo v. International Ass'n of Fire Fighters, Local 1066,* 55 *N.J.* 409, 262 *A.*2d 681 (1970).

The New Jersey Legislature has delegated authority to purchase construction services to State agencies through a comprehensive set of bidding laws. We have not previously understood those laws to confer on a public entity the authority to specify a sole source of construction services or to denote a specific union affiliation as a characteristic of the lowest-responsible bidder or as a bid specification. When it has desired to do so in the past, the Legislature has specifically provided authorization for limitations on the source of construction services. *See K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n,* 75 *N.J.* 272, 300–01, 381 *A.*2d 774 (1977) (upholding "Buy American" laws, but noting that they are not to be employed if "materials are not of satisfactory quality, or the cost would be unreasonably increased

or it would be impractical"), *appeal dismissed,* 435 *U.S.* 982, 98 *S.Ct.* 1635, 56 *L.Ed.*2d 76 (1978).

Project-labor agreements serve important purposes on major long-term construction projects. Effects of those agreements, such as preventing the expiration of collective-bargaining agreements of the different crafts during the term of the construction contract or resolving disputes among several crafts working on the project are useful. That usefulness is evidenced by the existence of such agreements on projects such as the Cleveland sports complex, *Northern Ohio, supra,* 1992 *WL* 119375; the Minneapolis bridge, *Glenwood Bridge, supra,* 940 *F.*2d 367; the Central Artery/Third Harbor Tunnel, *Central Artery, supra,* 565 *N.E.*2d 459; and the Boston Harbor, *Boston Harbor, supra,* —— *U.S.* ——, 113 *S.Ct.* 1190, 122 *L.Ed.*2d 565.

On balance, however, we do not believe that the standards of delegation set forth in our public-bidding laws yet embrace specifications for the type of project-labor agreement in this case, which designated a sole source of construction services and the exclusive organization with which a construction contractor might enter an acceptable project-labor agreement. The paramount policy of our public-bidding laws fosters "unfettered competition" in public contracts, *Terminal Construction, supra,* 67 *N.J.* at 410, 341 *A.*2d 327; the effect of project-labor agreements is to lessen competition. The policy choice is close; the lessened competition may produce other aspects of efficiency. *See Keyes Martin & Co. v. Director, Div. of Purchase and Property,* 99 *N.J.* 244, 252, 491 *A.*2d 1236 (1985) (acknowledging that Legislature may give Director of Purchase and Property discretion to award contract to one other than lowest-responsible bidder). Our function is not to make the policy choice; our function is to assess whether the TPA's choice is consistent with the existing State public-bidding policy to foster competition. The specification has not been "drafted in a manner to encourage free, open and competitive bidding," *N.J.S.A.* 40A:11–13, the current expression of State policy for public entities such as the TPA.

At oral argument, counsel for the TPA emphasized that its goals were to achieve "labor peace" and an "assured mechanism for resolution of disputes." The several interests of labor, management, and the public, in achieving those ends, can best be accommodated through involvement of the executive and legislative branches in the legislative process. That process can address the specifics of project-labor agreements, including issues such as whether a project should have a sole source of construction labor or whether existing employees of a contractor will be permitted to compete for the work; whether the agreement shall limit a contractor's ability to negotiate working conditions; whether one or more suitable mechanisms for resolving disputes should be put in place; and other relevant concerns. We need not assess in this case the provisions of Executive Order No. 11 that do not designate an exclusive source of construction labor or construction-labor representation, but describe a framework for agreement that would assure that all workers, of whatever affiliation, work in harmony and without interruption on a construction project.

The judgment of the Appellate Division is reversed. Resolution 19–93 is determined to be invalid as not currently authorized by the bidding laws of the State of New Jersey.

HANDLER, J., concurring.

This appeal presents the issue whether a governmental agency has the power in prescribing specifications for bids to do public work to require a prospective contractor to enter into an agreement under which the contractor becomes obligated to use the members of a specified labor organization on the public project in exchange for guarantees of labor stability. Specifically, this appeal asks the Court to consider the validity of two resolutions passed by the New Jersey Turnpike Authority (TPA or Authority), which require contractors who are awarded contracts on an extensive TPA project to enter into such a prehire agreement with the Building and Construction Trades Council (BCTC).

The resolutions were challenged by the George Harms Construction Company, a contractor which had successfully bid for a project contract before the contract was rebid with a specification requiring the use of a prehire project-labor agreement; by individual employees of Harms; and by the Utility and Transportation Contractors Association.

The Court today holds that our State public bidding laws and the policies underlying them do not allow State agencies to require contractors to enter into project-labor agreements with designated labor organizations. The Court also suggests that such project-labor agreements might, even if expressly authorized by the Legislature, violate article I, section 19 of the New Jersey Constitution. Because the Court now invalidates the challenged resolutions, it declines to consider whether the resolutions should have been subject to the procedural requirements that accompany formal administrative agency rulemaking.

I write separately because I disagree with the Court's conclusion that the State bidding laws prohibit the use of project-labor agreements. Further, I deem unwise the Court's extensive discussion of the constitutional implications of the challenged governmental actions presaging their constitutional infirmity. A narrower and firmer ground on which to rest a decision exists. I would find that the challenged resolutions constitute rulemaking, and that, therefore, this case should be remanded to the Authority so that it can comply with the rulemaking requirements that govern administrative agency action.

I

The Appellate Division determined that a project-labor agreement does not conflict with the statutory duty of the Authority to award the contract to "the lowest responsible bidder." *N.J.S.A.* 27:23–6.1. In that regard, the court noted that the Authority has discretion to fix appropriate contract requirements to ensure the effective completion of its work. The court found that given the complexity of the Turnpike project referred to as the Widening

Project, the numerous contracts involved, the time constraints and the necessity for all persons to work in close proximity and harmony, the Authority's determination that project-labor agreements will advance the public interest by promoting the timely and economic completion of the Widening Project was entirely reasonable and appropriate.

The Appellate Division distinguished *Wittie Electric. Co., Inc. v. State*, 139 *N.J.Super.* 529, 354 *A.2d* 659 (App.Div.1976), relied on by appellants, in which the court found that a public agency could not reject the lowest responsible bidder, a non-union employer, in favor of a union employer. That case, as pointed out by the Appellate Division, did not include specifications concerning the identity or status of the labor force.

The Court, however, concludes that project-labor agreements violate the public-bidding statute, *N.J.S.A.* 27:23–6.1(a). The Court finds that "[o]n balance ... the standards of delegation set forth in our public-bidding laws [do not] embrace specifications for the type of project-labor agreement in this case that designated a sole source of construction services and the exclusive organization with which a construction contractor might enter an acceptable project-labor agreement." *Ante* at 44, 644 *A.2d* at 95. The Court reasons that "the paramount policy of our public-bidding laws fosters 'unfettered competition' in public contracts" and that the TPA's actions are not consistent with that policy. *Ibid.*

I find nothing in either the language or the spirit of *N.J.S.A.* 27:23–6.1(a) that precludes the use of project-labor agreements. The Court itself observes that "[i]f in the construction and maintenance of [the] highway system the TPA deems a project-labor agreement necessary, the proposition that the requirement of such an agreement is within the TPA's mission is difficult to reject." *Ante* at 34, 644 *A.2d* at 90. Thus the Court acknowledges that within the delegated authority of the TPA is the general power to enter into a project-labor agreement.

*N.J.S.A.* 27:23–6.1(a) does not trench on that general power. It provides that the TPA, "in the exercise of its authority to make

and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, ... shall award ... contract[s] to the lowest responsible bidder." Responsibility may involve the financial ability, experience, and skills of the bidder. *See Arthur Venneri Co. v. Paterson Hous. Auth.,* 29 *N.J.* 392, 403, 149 *A.*2d 228 (1959). A bidder that satisfies those considerations and complies with the bidding specifications is "responsible," regardless of the status of the labor it chooses to employ. Thus in *Wittie Electric Co., supra,* 139 *N.J.Super.* at 532, 354 *A.*2d 659, the court held that a contractor's employment of non-union labor was not an appropriate factor to consider when determining the responsibility of that contractor, which had submitted the lowest bid for a public contract.

The "responsibility" of Harms is not at issue in this case. The TPA has at no point asserted that Harms is not a responsible bidder. Rather, the TPA has contended only that to be awarded a Widening Project contract, a bidder must be responsive to the explicit specifications that it has chosen to prescribe for the completion of the Widening Project. *See Keyes Elec. Serv. v. Board of Chosen Freeholders,* 15 *N.J.Super.* 178, 83 *A.*2d 61 (Law Div.1951) (holding that county was permitted to reject all bids and to add amended specification to project requiring that prospective contractor hire employees who would work in harmony with other trades employed on public-construction project and that all labor conform to practices of local labor unions).

The Legislature's goals in enacting the statutory requirement of awarding contracts to the lowest responsible bidder, as the Court observes, were to promote competition and to avoid favoritism, improvidence, and corruption. The way the Legislature accomplished those goals was by limiting the discretion of an agency to reject the lowest bid from a contractor that meets all applicable specifications as set forth in provisions inviting bids. The statute is specific in its method of accomplishing its general goals. Thus, the statute does not direct that an agency must, in every action it takes, promote competition at the expense of all other concerns.

However, the Court, invoking a general policy of the statute, converts that policy into an absolute requirement—the fostering of competition. Implicit in the Court's reasoning is that any specification that limits the number of bidders simply because some potential bidders cannot satisfy that specification is unreasonable and invalid. A specification that limits the number of bidders should invite critical scrutiny, but it should not be stigmatized as unreasonable without such scrutiny.

Requiring agencies to accept the lowest bids from responsible contractors that meet publicly-announced specifications accomplishes the goals of promoting competition and preventing favoritism. That requirement serves to prevent an agency from denying a contract to a contractor on non-specific, secretive grounds. The lowest-responsible-bidder statute ensures that a lowest responsible bidder will be denied a contract only for the very clearly-stated and public reason that its bid did not comply with explicit specifications.

Although the lowest-responsible-bidder requirement fosters competition and eliminates favoritism, it does not mandate that those goals must be achieved by limiting the type of specifications that an agency can use in the performance of public works. Public entities "may, without violating the rule requiring freedom of competition, insert proper conditions in their proposals for bids," as long as bids do "not *unduly* restrict competition." 18 Eugene McQuillan, *The Law of Municipal Corporations*, § 29.44 (3d ed. 1984) (emphasis added). Thus our courts do not invalidate specifications that may incidentally deter competition unless they are not reasonably related to the work to be performed. See, *e.g., Waszen v. City of Atlantic City,* 1 *N.J.* 272, 63 *A.*2d 255 (1949) (striking down bid proposal because it contained several specifications that had effect of eliminating from competition *all* prospective contractors except the contractor that had previously performed the needed service and that had no reasonable relationship between the purpose of the specification and the character of the work to be performed under the contract).

As the Court here notes, " 'specifications cannot be so precise as to knowingly exclude all but one prospective bidder.' " *Ante* at 41, 644 *A.2d* at 93 (quoting *Utilimatic, Inc. v. Brick Township Mun. Util. Auth.,* 267 *N.J.Super.* 139, 145, 630 *A.2d* 862 (Law Div.1993)). The specification challenged in this case, however, does not eliminate all but one bidder. Although the resolutions prescribing the specification designate a single source of labor, the specification does not either directly or indirectly limit the competition to a single bidder. There is no indication in this case that a significant number of contractors were precluded from bidding on the project by the challenged specification. The current specification, unlike those at issue in *Waszen,* has only a remote and largely speculative effect on competition.

Further, the TPA has put forth evidence suggesting that the challenged specification is "reasonably related" to its legislatively-delegated task. The decision of public agencies throughout the country to use project labor agreements also supports the position that they are not unreasonable. *See, e.g., Building & Construction Trades Council v. Associated Builders and Contractors, Inc.,* —— *U.S.* ——, 113 *S.Ct.* 1190, 122 *L.Ed.2d* 565 (1993); *Minnesota Chapter of Associated Builders and Contractors, Inc. v. St. Louis County,* 825 *F.Supp.* 238, 244 (D.Minn.1993); *Associated Builders and Contractors, Inc. v. City of Seward,* 966 *F.2d* 492, 499 (9th Cir.1992), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 1577, 123 *L.Ed.2d* 146 (1993); *Northern Ohio Chapter of Associated Builders & Contractors, Inc. v. Gateway Elec. Development Corporation,* No. 1:92CV0649, 1992 *WL* 119375 (N.D.Ohio May 12, 1992); *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 *F.2d* 367 (8th Cir.1991); *Utility Contractors Ass'n of New England, Inc. v. Department of Public Works,* 29 *Mass.App.Ct.* 726, 565 *N.E.2d* 459 (1991). Furthermore, two successive governors in this State have concluded that project-labor agreements are reasonable mechanisms to effectuate labor stability. *See Executive Order No. 99* (September 13, 1993) (E.O. 99) and Executive Order No. 11 (March 21, 1994) (E.O. 11). The TPA has also set forth plausible reasons for adopting

project-labor agreements.[1] Moreover, given the TPA's governmental mission, delegated authority and extensive experience in dealing with construction-industry labor, the governmental competence and the expertise reposed in the TPA surely include the ability to determine the advisability of using project-labor agreements. *See, e.g., Metromedia, Inc. v. Director, Division of Taxation*, 97 *N.J.* 313, 478 *A.*2d 742 (1984) (recognizing that agency's expertise is entitled to great respect by courts, particularly when exercised in specialized area covered by statutory provisions relevant to agency's purpose).

## II

The Appellate Division also determined that a project labor agreement does not undermine the rights of persons "to organize and bargain collectively," *N.J. Const.* art. I, § 19, but imposes

---

[1] The TPA cited the following justifications for the use of project labor agreements:

> (1) Strikes and other labor actions could cause delay, disruption and added expense for the Widening Project and significant safety concerns for the public and workers;
>
> (2) The TPA has a tight timetable for the completion of the Widening Project;
>
> (3) There is a great potential for delay, disruption and added expense and danger to the public and workers if the integrated Widening contracts are not coordinated;
>
> (4) BCTC has demonstrated a willingness to picket and strike;
>
> (5) BCTC workers already have an exclusive presence on the Widening Project;
>
> (6) BCTC workers will continue to have an extensive presence on the Widening Project because all the contractors on the Widening Project to date and all or nearly all potential builders other than Harms have collective bargaining agreements with BCTC;
>
> (7) BCTC unions have an adequate workforce to staff the Widening Project;
>
> (8) Project–Labor agreements can expressly prohibit strikes and establish effective and efficient dispute-resolution mechanisms;
>
> (9) Exclusivity is part of the consideration for BCTC agreeing not to strike;
>
> (10) Exclusivity is required for the additional reason that BCTC and the Steelworkers are long-time antagonists and cannot work without strife in the close proximity on the Widening Project's tight confines of the Southern Mixing Bowl.

contract obligations only on the employer-contractor and the designated labor organization. The Court today suggests that requiring contractors to enter project-labor agreements with designated labor organizations might infringe on that constitutional right.

The Court does not determine the constitutional issue in this case, but nonetheless intimates that project-labor agreements are constitutionally suspect. I disagree with the Court's implication that the constitutional right to organize is threatened by the TPA's actions in this case. Countervailing considerations can be marshalled to suggest that no violation of constitutional rights will occur as a result of the use of project labor agreements. I think, therefore, the Court should have refrained from its extended discussions of possible constitutional issues and their resolutions. *See, e.g., O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 240, 624 *A.*2d 578 (1993) ("[C]ourts should not reach constitutional questions unless necessary to the disposition of litigation."); *In re Township of Warren*, 132 *N.J.* 1, 43, 622 *A.*2d 1257 (1993) (Pollock, J., concurring); *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 109, 609 *A.*2d 11 (1992) (Pollock, J., concurring).

There are a number of considerations omitted from the Court's discussion that should obviate any need to address constitutional concerns. Members of the BCTC, in accordance with their State and federal rights, have chosen the BCTC as their representative. The resulting organization is a powerful one that has acted in the interest of its members. If it fails to act in the interests of its members, the members are free to elect new representatives or to reorganize. That employees who are not members of the BCTC are not privy to the work on this project does not mean that their fundamental right "to organize and bargain collectively" has been undermined. The Steelworkers Union, representatives of the appellant employees, is in no way precluded from negotiating collectively to insure that it is the exclusive source of labor on future projects in which an agency deems that reliance on a sole source of labor is necessary. Further, no evidence shows that the

TPA's action was aimed at undermining the rights of the appellant employees to organize and to bargain through the Steelworkers Union. That the TPA deemed the BCTC to be a more appropriate source for labor on the Widening Project does not evidence an intent to undermine the rights of workers to organize as they so choose and bargain accordingly.

Those considerations do not by any means settle the constitutional score. They do, however, militate strongly against the wisdom of the Court's extended constitutional foray.

### III

I do not believe the challenged specification violates the lowest-responsible-bidder statute, and therefore, I find necessary consideration of whether the action of the TPA is invalid because it constitutes improper rulemaking. The question is whether in adopting its specification the TPA should have engaged in formal rulemaking.

Whether formal rulemaking procedures must be invoked depends on whether the agency action can be characterized as a "rule." An agency's action constitutes a "rule" when it is a formal expression or statement of administrative policy effectuating the agency's statutory authority. *See* Administrative Procedure Act, *N.J.S.A.* 52:14B-1 to -15. *N.J.S.A.* 52:14B-2(e) provides: " 'Administrative rule' or 'rule' when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy...." *Metromedia* synthesized the factors to be considered when determining whether an agency should use administrative rulemaking: Agency action must be validated through formal rulemaking if it

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudica-

tion or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[97 *N.J.* at 331–32, 478 *A.*2d 742.]

"All six of the *Metromedia* factors need not be present to characterize agency action as rulemaking, and the factors should not be merely tabulated, but weighed." *In re the Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 518, 524 *A.*2d 386 (1987).

The TPA claims that rulemaking is inappropriate because the Authority's challenged action applies to only the current project. Although that assertion is correct in a narrow sense, the TPA fails to recognize that, at the time taken, its actions, as applied to the Widening Project, were prospective, or to acknowledge the prospective potential of its actions.

Moreover, the specification requiring a project-labor agreement is a standard that will "have wide coverage encompassing a large segment of the regulated . . . public," *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742, because the number of contractors and construction-industry employees affected by the TPA's decision to use project-labor agreements constitutes a substantial portion of the "regulated public." Furthermore, the challenged TPA action implicitly "prescribes a legal standard or directive that is not otherwise . . . inferable from the enabling statutory authorization." *Ibid.* Although I find that the challenged TPA action is within its power, as the Court itself acknowledges, *ante* at 34–35, 644 *A.*2d at 90, the decision to use project-labor agreements is not expressly provided for by statute. Additionally, the challenged action "reflects an administrative policy that . . . was not previously expressed in official and explicit agency determination or rule" and it "constitutes a material and significant change from a clear, past agency position on the identical subject matter." *Ibid.*

That the TPA should have engaged in rulemaking is bolstered by this Court's decision in *Crema v. New Jersey Department of Environmental Protection,* 94 *N.J.* 286, 463 *A.*2d 910 (1983), in which we held invalid a permit issued by the Department of

Environmental Protection (DEP) granting "conceptual" approval of a residential/commercial development in an area governed by the Coastal Area Facility Review Act (CAFRA). In *Crema*, the actions of the DEP were held unacceptable because the issuance of approval could not have fairly been anticipated or addressed by the public and the agency did not establish substantive criteria before the administrative proceedings for determining how to qualify for "conceptual approval." "The public had no meaningful opportunity to shape the criteria that ultimately affected their interests." *Id.* at 302, 463 *A*.2d 910. Similar concerns attend the actions of the Authority in this case. The TPA failed to establish any criteria against which the decision to use project-labor agreements could be judged. Furthermore, the regulated public had no opportunity to express its concerns and add its views to the process of determining the best method of dealing with the problem of potential labor strife.

Additionally, *State of New Jersey, Department of Environmental Protection v. Stavola*, 103 *N.J.* 425, 511 *A*.2d 622 (1986), supports the proposition that the TPA was required to follow the rulemaking procedures. In *Stavola*, the DEP attempted to restrain two developers from constructing "deluxe" beach-club cabanas, which the DEP contended were within the CAFRA definition of "facilities" requiring construction permits. The Court held that if the DEP has the implied statutory authority to regulate certain beach-club cabanas, then its ruling in the case before it would apply to all other beach clubs contemplating constructing or renovating cabanas, thus falling in the guidelines of *Metromedia*. *Id.* at 438, 511 *A*.2d 622. The Court also maintained that the DEP's decision lacked standards by which other clubs could determine whether they were subject to regulation. *Ibid.* The *Stavola* analysis compels the conclusion that the Authority's actions in this case constitute similarly unacceptable, unfettered, standardless administrative-agency discretion. *See also In re Certain Amendments to the Adopted and Approved Solid Waste Management Plan*, 133 *N.J.* 206, 627 *A*.2d 614 (1993) (holding that where emergency order adopted by DEPE redirecting flow of

solid waste within county as intended to implement county's amended plan for disposal of waste and to extend beyond 180 days, agency was required to adhere to APA rulemaking requirements).

The Court, although it does not directly address whether rulemaking is required, suggests "that whatever policies for project-labor agreements the TPA pursues, it would develop such policies more effectively following a hearing process." *Ante* at 19, 644 *A.2d* at 81. The Court's vague assertion that "a hearing process" would be helpful undervalues the importance of requiring formal rulemaking procedures when appropriate. Under *Metromedia,* the Authority should be required to make explicit through rulemaking the standard it seeks to follow in deciding whether to require project labor agreements in its public projects.

The Court, in striking down the resolutions of the TPA, takes comfort in the fact that the policy considerations surrounding the use of project-labor agreements are appropriately legislative in nature. *Ante* at 43, 644 *A.2d* at 94. It anticipates that the Legislature will undertake to determine whether to authorize the use of such agreements. *Id.* at 44, 644 *A.2d* at 95. I agree generally that the practicalities and wisdom of the use of project-labor agreements by governmental bodies in the completion of public works is not a judicial subject. It belongs to the other branches of government. *See, e.g.,* E.O. 11, *supra* (noting that agencies should determine whether to use project-labor agreements on a case-by-case basis).

As the Court observes, "A project-labor agreement has many subtle and complex facets." *Ante* at 19, 644 *A.2d* at 82. The complexity of project-labor agreements makes all the more important that the solution ultimately arrived at is achieved based on the knowledge, experience and expertise of the Authority. The public process associated with rulemaking will assure that. It will remit this difficult and controversial subject to the other branches of government, where it properly belongs. It will of necessity require the agency through public notice and hearings to expose

its proposal to vigorous and healthy public debate and will compel agency consideration of the views expressed by the parties and other persons who have construction-industry interests. *See N.J.S.A.* 52:14B-4. In addition, if the TPA were ultimately to authorize and require project-labor agreements, after going through the rulemaking process, a more complete record concerning the justifications for the use of project-labor agreements would then exist and the courts, if necessary, could better evaluate the reasonableness and validity of its policy. The public nature of rulemaking would also tend to neutralize any charges or implications of favoritism associated with the TPA's decision to employ project-labor agreements in the absence of proper rulemaking. Finally, the Legislature will retain the power to exercise through legislative oversight its own authority over any such rule that validates the use of project-labor agreements. *See N.J. Const.* art. V, § 4, ¶ 6; *Enourato v. N.J. Building Auth.,* 90 *N.J.* 396, 448 *A.*2d 449 (1982). Thus, an appropriate legislative role need not depend, as it does under the Court's decision, on the statutory invalidation of the TPA's resolutions under the public-bidding statutes.

## IV

For the foregoing reasons, I concur in the judgment of the Court.

WILENTZ, C.J., joins in this opinion.

WILENTZ, C.J., and HANDLER, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.